UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————————x
                                         :

UNITED STATES OF AMERICA,           :

   - against -                 :

                                       :      No. 17 Cr. 127 (KMW)

JOSEPH MELI,                  :

                                     :

                        Defendant.   :

                                         :

—————————————————————————————x

## **SENTENCING MEMORANDUM ON BEHALF OF JOSEPH MELI**

Daniel J. Fetterman           Daniel L. Stein
Michael P. Bowen             Mayer Brown LLP
Jeffrey R. Alexander          1221 Avenue of the Americas
Joshua S. Brown               New York, New York 10020
Kasowitz Benson Torres LLP   (212) 506-2500
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Joseph Meli*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND .....................................................................................4

I.      Joe Has Lived an Extraordinary Life of Dedication to Family, Good Deeds, and Charitable Acts...........................................................................................................4

        A.      Joe is a Supremely Dedicated Family Man..........................................................5

                1.      Dedicated Son and Brother .........................................................5

                2.      Devoted Husband..............................................................................7

                3.      Exceptional Father .........................................................................8

        B.      Joe Has Lived a Life of Generosity .....................................................13

II.     The Aberrational Nature of the Offense .................................................................17

        A.      The Indictment and Guilty Plea .......................................................................18

III.    The Federal Sentencing Guidelines Substantially Overstate the Seriousness of Joe's Offense and a Non-Guidelines Sentence is Warranted...............................21

        A.      Legal Standard ...............................................................................................21

        B.      The Guidelines Calculation...............................................................................22

        C.      The Nature and Circumstances of the Offense ....................................................22

                1.      Joe's History and Background in the Entertainment Industry Led Him to Create his Ticket Reselling Business................................................23

                2.      In 2011, Joe Founded his Ticket Reselling Business:  Advance Entertainment..............................................................................26

                        a.      Joe's "Cash Problem"                          32

                3.      Joe Had a Larger Vision for the Secondary Ticket Market .....................34

                4.      Other Mitigating Factors Weigh in Favor of a Lenient Sentence.............36

                        a.      The Loss Amount Overstates Joe's Culpability         37

                        b.      The Varacchi/Sentinel Conduct                 40

i

          c.      Mitigating Circumstances Relating to Craig Carton     43

D.     The Nature and Characteristics of the Defendant ...................................................45

E.     The Need for the Sentence ......................................................................................49

F.     Sentencing Guidelines Range .................................................................................52

      1.     The ABA Guidelines are Instructive and Suggest that a Sentencing Range of Not More Than 21 to 27 Months is Appropriate.......................54

      2.     Alternatively, the Court Should Look to the 1987 Guidelines in Determining which Non-Guidelines Sentence is Appropriate...................55

G.     The Need to Avoid Unwarranted Disparity ............................................................56

H.     The Need to Provide Restitution.............................................................................58

I.      To Achieve the Goals of Sentencing, the Court Should Consider Substituting a Portion of Joe's Sentence with Home Confinement and a Substantial Community Service Condition..........................................................59

CONCLUSION.....................................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)................................................................................50

*Kimbrough v. United States*,
  552 U.S. 85 (2007)..................................................................................55

*Securities and Exchange Commission v. Meli*,
  17-cv-632-LLS (S.D.N.Y.) ...........................................................20, 37, 38

*Securities and Exchange Commission  v. Zandford*,
  535 U.S. 813 (2002)................................................................................49

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006).......................................46, 51, 52

*United States v. Ali*,
  508 F.3d 136 (3d Cir 2007)......................................................................46

*United States v. Autery*,
  555 F.3d 864 (9th Cir. 2009) ...................................................................60

*United States v. Brady*,
  2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) ..............................................61

*United States v. Carton*,
  17-cr-680 (S.D.N.Y. 2017) .......................................................................45

*United States v. Caspersen*,
  16-cr-00414 (S.D.N.Y Nov. 4, 2016) .................................................53, 54

*United States* v. *Cavera*,
  550 F.3d 180 (2d Cir. 2008).................................................................21, 56

*United States v. Chettiar*,
  501 F.3d 854 (8th Cir. 2007) ...................................................................60

*United States v. Chiarella*,
  588 F.2d 1358 (2d Cir. 1978)...................................................................50

*United States v. Cooper*,
  394 F.3d 172 (3d Cir. 2005).....................................................................47

*United States v. Douglas*,
713 F.3d 694 (2d Cir. 2013)............................................................................48

*United States v. Duhon*,
541 F.3d 391 (5th Cir. 2008) .........................................................................60

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004)............................................................53

*United States v. Faibish*,
12-cr-265 (E.D.N.Y. Aug. 3, 2015) ...............................................................54

*United States v. Fernandez,*
443 F.3d 19 (2d Cir. 2006)..............................................................................19

*United States v. Gray*,
15-cr-00297 (S.D.N.Y. Oct. 25, 2016) ...........................................................58

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012)........................................................51, 53

*United States v. Warner*,
13-cr-00731 (N.D. Ill. Jan. 14, 2014) .............................................................61

*United States v. Hampton*,
13-cr-301 (S.D.N.Y. 2013) .............................................................................58

*United States v. Hochfeld*,
13-cr-00021 (S.D.N.Y. Aug. 5, 2013) .........................................................56, 58

*United States v. Jones*,
460 F.3d 191 (2d Cir. 2006)............................................................................21

*United States v. Litvak*,
13-cr-0019 (D. Conn. July 23, 2014) ..............................................................54

*United States v. Lumiere*,
16-cr-00483 (S.D.N.Y. May 31, 2017).............................................................58

*United States* v. *Nastri*,
633 F. App'x 57 (2d Cir. 2016) .......................................................................47

*United States v. Nesbeth*,
188 F. Supp. 3d 179 (E.D.N.Y. 2016) .............................................................50

*United States* v. *Newkirk*,
16-cr-1341 (S.D.N.Y. Apr. 21, 2016) ..............................................................58

*United States v. Peacely*,
   628 F.3d 72 (2d Cir. 2010).......................................................................21

*United States v. Rangel*,
   697 F.3d 795 (9th Cir. 2012) ...................................................................59

*United States v. Rita*,
   551 U.S. 338 ..............................................................................................46

*United States v. Rivernider*,
   10-cr-00222 (D. Conn. Dec. 18, 2013) ...................................................53

*United States v. Rivernider*,
   828 F.3d 91 (2d Cir. 2016)................................................................53, 54

*United States v. Serafini*,
   233 F.3d 758 (3d Cir. 2000)....................................................................47

*United States v. Shamilzadeh*,
   04-cr-194 (E.D.N.Y. Apr. 1, 2008) .........................................................61

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987)......................................................................23

*United States v. Thurston*,
   544 F.3d 22 (1st Cir. 2008) .....................................................................46

*United States v. Tomko*,
   562 F.3d 558 (3d Cir. 2010)....................................................................47

*United States v. Watts*,
   10-cr-00627 (E.D.N.Y. Apr. 24, 2014) ...................................................56

**Statutes**

18 U.S.C. § 3553(a) ................................................................................ *passim*

18 U.S.C. § 3664(d)(5) ....................................................................................20

U.S.S.G. § 2B1.1................................................................................22, 52

U.S.S.G. §§ 2F1.1 ...........................................................................................56

U.S.S.G. § 2J1.2(b)(1)(C) ..............................................................................53

U.S.S.G. § 2K1.5(b)(1) ...................................................................................53

U.S.S.G. § 2K2.1(b)(3)(A): 15 ......................................................................53

U.S.S.G. § 2R1.1(b)(2)(H): 16 ............................................................... 53

U.S.S.G. § 3A1.4(a) ............................................................................. 53

U.S.S.G. § 5C1.1(f) .............................................................................. 60

U.S.S.G. § 5K1.1 ............................................................................ 19, 57

## Other Authorities

Kate Stith and Jose A. Cabranes, FEAR OF JUDGING: SENTENCING GUIDELINES IN
    THE FEDERAL COURTS 104 (1999) ............................................... 56

Probation and Pretrial Services, *Court & Community Informational Series:*
    *Community Service* (2005), available at
    http://www.uscourts.gov/misc/revision-community.pdf ....................... 60

U.S.S.C., *Fifteen Years of Guidelines Sentencing* (2004) ........................... 56

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:*
    *Restorative Justice and White-Collar Crime*, 8 CARDOZO J. CONFLICT RESOL.
    421, 447 (2007) ..................................................................... 51

This memorandum is submitted on behalf of Joseph Meli in support of leniency in connection with his sentencing for one count of securities fraud.  The sentencing is scheduled for March 27, 2018.[1]

## PRELIMINARY STATEMENT

Joseph Meli pleaded guilty to providing false documents to investors in connection with his ticket resale business.  Joe accepted responsibility for, and profoundly regrets, this crime.

As the over 100 letters of support – from Joe's friends, family and business colleagues – show, the actions for which Joe will be sentenced were out of character.  Joe made his business reputation in the entertainment industry, both as an event producer and more recently as a tour financier and ticket reseller, buying block sales of advance tickets for Broadway plays, large-venue concerts and major sporting events.  He was successful in no small part due to his trustworthiness, fairness, and generosity in his business dealings.  He was universally well-liked and respected in the entertainment industry.

Moreover, he is, and has always been, extremely devoted to his family and community. Joe Meli is a committed family man:  a loving husband to his wife, ████████ and a devoted, hardworking father to his four young sons – ████████ ████████ ████ and ████ He is the glue that holds his nuclear and extended families together.  He has been instrumental in providing financially for his retired parents and for his older sister, ████ ████████████████, and her three children.  His highest priority is his family – specifically, his children and nieces and nephews – and their well-being.

---

[1]    The letters from Joe's family, friends, and investors have been provided in the accompanying Addendum of Sentencing Letters.  References to the sentencing letters are cited as "Ad. Ex. __" and are numbered exhibits.  The other exhibits provided relate primarily to the nature of Joe's business and are lettered exhibits cited as "Ex. __."

In addition to his immediate family, Joe has exhibited special regard throughout his life for the friends and business colleagues who make up his extended family, including life-long friends he grew up with and the scores of new friendships made later in his life.  From the awkward teenagers to whom he gave confidence, to the Cambodian refugees he welcomed to his school, to the neighborhood mother struggling with a ███████ child, ████████████████ and her three children whom he has supported for twenty years, to the cousins he sustained when their father passed away, to the ███ ████████ for whom he threw a building-wide fundraiser, to his grieving family members and friends who turned to him in times of need, Joe has been a good neighbor, good citizen and good person.  He genuinely cares for other people, and has lived a life of good deeds and helping others.

Joe's aberrant conduct was not consistent with his lifetime of charitable deeds and acts. His lapse in judgment was facilitated by his own personal shortcomings ██████████████████ █████████.  Moreover, his generous and trusting nature, as described more fully below, contributed to the sequence of events in which Joe made grievous errors of judgment that resulted in the crime for which he has pleaded guilty and has accepted responsibility.  While he has no significant criminal history, ████████████████████████████████████.  ████ ███████████████████████████████████████████████████████████ ████████████████████████.

The stipulated, advisory Sentencing Guidelines, based on an irrational over-emphasis on "loss" calculations, results in a custodial sentence range of 78 to 97 months.  When viewed in light of the 18 U.S.C. § 3553(a) factors, such an outcome overstates the seriousness of the offense and is far greater than necessary.  In the Presentence Investigation Report (ECF No. 111) (the "PSR"), the Probation Office – without the benefit of the more than 100 letters detailing

Joe's lifetime of kindness and good deeds – recommended a below-Guidelines sentence of 54 months.  As set forth more fully herein, we respectfully submit that when the Court takes into consideration the exemplary life of charity, kindness, and commitment to his family, along with the mitigating factors that flow from the unique, nuanced, and complex nature of his business and criminal conduct, this Court should impose a sentence of no more than 21 to 27 months, and consider substituting some of that time with home confinement and community service.

The complex and nuanced circumstances of Joe's offense demonstrate that this was not a predatory offense deserving of such severe, ruinous punishment.  Joe did not calculatingly set out to steal or defraud; rather, he – illegally – shifted risk to unwitting investors by making false statements.  This was not the Ponzi scheme it was made out to be in the media reports of his arrest and it was not a "fictitious business" where no tickets or ticket deals ever existed and money was simply stolen for selfish reasons.

To the contrary, Joe spent 15 years as a world-class promoter and producer of live-events who, based on his extensive knowledge and network within the entertainment industry, built a thriving and lucrative ticket business.  Investors sought him out.  In his ticket resale business, Joe worked to make, and secure funding for, deals between sellers of blocks of tickets and end-user buyers in the secondary market for tickets.  While there is (and always has been) a secondary market for tickets to live events – and many businesses, like StubHub, sell in that market – it is a market that demands anonymity and many sellers, for various reasons, used intermediaries like Joe to maintain their anonymity.

In that context, Joe created false "contracts" to convey to certain investors that the source and quantity of tickets had been *contractually* secured from the parties identified in the agreements when, in fact, that was not the case.  Even though Joe believed he would obtain the

tickets using a variety of discrete methods that had repeatedly proven reliable and successful in the past – and, in many instances, did secure the tickets he said he'd obtained – his use of such false documents was wrong, and was a federal crime as he has acknowledged in his guilty plea and for which he is genuinely remorseful.

Joe Meli committed a crime that was totally out of character for him.  He has accepted full responsibility for it and has done, and will continue to do, everything in his power to make amends.  On his behalf – and that of his family and wide circle of extended family and friends – we respectfully submit that, based on the considerations set forth in 18 U.S.C. § 3553(a), a sentence of no more than 21 to 27 months, with some of that time possibly substituted with home confinement and community service, is "sufficient, but not greater than necessary" to satisfy all of the sentencing factors of § 3553(a).  Such a sentence would be just and proportional – one that will allow him to make amends with his investors and business partners, to rebuild his livelihood, to continue his unwavering support for his children and wider family, and to resume his role as a kind and charitable member of society.

## FACTUAL BACKGROUND

I.    **Joe Has Lived an Extraordinary Life of
      Dedication to Family, Good Deeds, and Charitable Acts**

As in any case, the crime that brings Joe before this Court did not occur in a vacuum.  As always, it arises out of a set of circumstances and characteristics unique to the individual now before the Court.  Few defendants have come before this Court with such a demonstrated history of charity, generosity, and care for others.  We respectfully request that Joe be judged not by the crime to which he's pled guilty, but by the life he has lived defined by exemplary charity and kindness.

The portrait that emerges from the more than 100 letters in support from friends, family and others is that of a caring, generous man – a dedicated husband, father, and family man who also deeply loves his friends, and his broader community, and has consistently expressed that love through heroic acts of kindness.  Joe *lives* charitably.  Helping others — whether through emotional support, career advice, or much-needed financial assistance like providing for ███ ████████████████████████████████████████████████████████ — is the very fabric of Joe's life.  Generosity fundamentally defines who Joe is, and the flood of support and love that Joe pours out into the world is a continual, integrated aspect of his daily life, and not something he does by, for example, volunteering every other weekend or by simply donating money to charitable organizations and attending functions.

### A.    Joe is a Supremely Dedicated Family Man

"Joe's most honorable quality is his dedication to his family."  Ad. Ex. 1 (███ ██████ Letter).  "[W]hen it comes to his family, Joe is always digging deep down for his absolute best, and then pouring it back into them.  They are, and always have been, at the very center of his world."  Ad. Ex. 2 (████ ████ Letter).  Joe "mak[e]s sure everyone's needs are taken care of before his own."  Ad. Ex. 3 (██████ ████ Letter).  "If there is one word that best describes [Joe] it would be 'Family.'"  *Id*.

### 1.    Dedicated Son and Brother

Joe Meli was born in New York City to two loving parents, ████ and ████ ███ with whom he remains remarkably close today.  PSR ¶ 59.  He lives in the same building with his parents who are one floor below Joe's family.  *Id*.  As an adult, Joe has supported his parents emotionally — and financially — for many years.  Joe's father describes him as "overly generous to his mother and me, as well as, to numerous other friends and family members."  Ad. Ex. 4 (██████ ████ Letter).  He has "a wonderful relationship with his parents but I believe he

5

feels more of a burden than a son should." Ad. Ex. 5 (███ ███ Letter). Joe's mother

describes him as a "kind, caring, loving, [and] generous" son, saying that her life "has been

enriched by all the experiences [they] have had" together and that his "presence in our world is

not only greatly appreciated, but those who know him feel his positive presence is absolutely

essential." Ad. Ex. 6 (███ ███ Letter).

Joe has two sisters:  one older (███ ██████ one younger (████ █████ Joe's

sisters "have both relied on him and looked up to him" and "[w]hen either of them is feeling

uncertain or in need of help, they think of Joe." *Id*.  Since Joe was a boy, he has felt a duty to

protect his family and that "the needs of his sisters always took precedence over his own." Ad.

Ex. 3 (██████ █████ Letter).



Joe's younger sister, ██████ was born exactly four years after Joe.  Growing up, Joe and

his sisters enjoyed a loving and supportive relationship with each other.  They learned to stick up

for one another and to encourage each other's interests.  Joe regularly attended his sisters'

recitals and plays; they frequently cheered Joe on at his sporting events. "He was the 9th grade boy that coached my 5th grade basketball team . . . He was the Senior in High School that came on my 8th Grade school field-trip as a chaperone because he knew I'd never slept away from home and he didn't want me to be scared or miss out." Ad. Ex. 9 (██████ ██████ Letter). As ██████ described growing up with Joe, her memories "are around his exceptional sensitivity, awareness and prioritization of love, friendship and loyalty." *Id*. She remembers "being a priority to him always and having a confidence, self-esteem and security that would not exist if it weren't for him." *Id*.

In 1995, as Joe was entering his senior year of college, his parents were forced to move away from their home in Utah. Because ██████ wished to finish high school in Utah, Joe left Boston University with one year remaining and enrolled at the University of Utah to watch over her until she finished school. PSR ¶ 85.[2] A friend from Joe's time at the University of Utah remembers Joe "as loyal as the day is long," "constantly want[ing] the best for others. It's no secret he cheers for the underdog." Ad. Ex. 10 (██████ ██████ Letter). Joe practiced, "humility, empathy all wrapped up in a laugh and a smile" — as he does to this day. *Id*.

### 2. Devoted Husband

Joe met his wife, ██████ ██████ when they were both 12 years old and attended rival Minneapolis schools. PSR ¶ 63. They started dating 10 years later, when they were 22, and were engaged on September 9, 2001, and soon thereafter ██████ became pregnant.[3] Joe and

---

[2]     Although Joe always thought that he had graduated from the University of Utah, he discovered in 2015 during a background check that he was a few credits shy of a bachelor's degree, due to an issue with credits transferred from Boston University. He hopes to rectify that error and obtain his degree.

[3]     Joe's sister ██████ remembers when Joe learned that ██████ was first pregnant. She noticed "a shift of priority and love in his eyes that was more profound and important to him than anyone or anything I'd witnessed to that point in time." Ad. Ex. 9 (██████ ██████ Letter). Joe "never shirked from his fatherly responsibilities" though his first son arrived at an age where

██████ were married on October 5, 2002 in Minneapolis, where they had first met as children.

*Id.*  "Their partnership is solid.  They have weathered ups and downs with positivity and grace.

Their love and belief in one another and the family they've built is unshakable."  Ad. Ex. 12

(████ ████████ Letter).  As a husband, Joe is "loving and supportive."  *Id.*  Together, Joe and

████ have four sons, ranging from ████ years old.

"Never in my life had I known someone to be so wholeheartedly caring, and nurturing,

and so full of life."  Ad. Ex. 13 (████ ████ Letter).  Looking back at their relationship, ████

explained that because "Joe moved to a new city and school each year" as a boy, "I think it's no

wonder that he found me and fell in love as I represented a place he called home for the longest

period of time."  *Id.*  As a father, ████ describes Joe's care for their four boys ████ ███,

████ ███, ███ ██, and ████ ██ as paramount to everything:  "Joe instilled in our boys that

dedication to family is central to everything.  Kindness and empathy came naturally to our older

sons, but it was driven home every day by Joe."  *Id.*  "Joe is dedicated to our sons

wholeheartedly.  He is so proud of them, enjoys their company and would choose to attend a

game or a concert with them over anything."  *Id.*  Even when it came to Joe's arrest, Jessica

explained how Joe waited alone in the lobby of their building to be arrested because his priority

was to spare his sons and wife from witnessing a "life scarring moment."  *Id.*

### 3.     **Exceptional Father**

As almost all of the more than 100 letters submitted by Joe's family and friends attest,

Joe is a dedicated and involved father, who is a central presence in his boys' lives.  Joe's dad

---

Joe's social peers were interviewing for first jobs and dating, and he had "no circle of friends to
turn to for support to share in that massive life-changing event."  Ad. Ex. 11 (████ ████████
Letter).  Joe's oldest son "could have been a casualty of early fatherhood, of bad decisions, of
immaturity" but instead, because Joe put fatherhood and providing for his family above all else,
today ████ "represents the very best of Joe."  *Id.*

writes that: "I know of nothing more important to him than his four boys."  Ad. Ex. 4 (███████

████ Letter).  "He and his older boys work out together in the gym and go running together.  He

spends weekends driving them to and from their different activities, games and social events."

*Id.*  Joe "does not hold back in his love for his boys or his love of being their father.  And his

sons beam with the love they have for him when he is around or when they talk about him.  Their

dad is their best friend."  Ad. Ex. 14 (████ ████ Letter).

 "Any description of Joe Meli would be incomplete if it did not touch on Joe as a father."

Ad. Ex. 15 (████ ████ Letter).  A father of only one boy expressed "awe" when witnessing

"Joe's dedication and involvement when it comes to his children."  *Id.*  Even when Joe was

diagnosed with thyroid cancer, "his main focus was to get well so he . . . could take care of their

boys."  Ad. Ex. 3 (████████ ████ Letter).  As Joe and ████ nanny, ████ wrote: "Joe

Meli is the heartbeat of his family."  Ad. Ex. 16 (████ ████ Letter).   Joe is an "exceptional

parent" — "totally involved, deeply committed."  Ad. Ex. 17 (████ ████ Letter).  By

"exceptional," I mean "there may be none better."  *Id.*  "Joe swells with love and pride whenever

he talks about his children."  Ad. Ex. 2 (████ ████ Letter).  "When there was a prospect of

him being away from his boys, I saw a pain and heartbreak that I hadn't seen from anyone."  Ad.

Ex. 18 (████ ████ Letter).

 It takes "very little time to discern what an incredible father he is."  Ad. Ex. 19 (████

████ Letter).  Indeed, Joe chose to live in New York City because "[l]iving elsewhere would not

give him the opportunity to be so closely involved in the everyday lives of his family" and he did

not want to lose precious time with his children to a commute. Ad. Ex. 3 (████████ ████

Letter).  "I have never known a father more devoted to his children than Joe.  He is involved in

every aspect of each of his children's lives.  He makes time to provide them with the important

lessons of life that any good father would hope to pass on to their children as they mature and face life's burdens." Ad. Ex. 20 (███████ ███████ Letter). "He rarely misses any athletic event that they are involved in and also encourages them to attend to their school work and other commitments." *Id*. Joe "has been one of the best fathers I have met . . . . He is very involved with his kids, whether it's attending every soccer game, basketball, and any other extracurricular they are part of." Ad. Ex. 21 (███████ ███████ Letter). Simply put, Joe is the opposite of a "weekend dad." Ad. Ex. 22 (███████ ███████ Letter). "He is there working through the day-to-day issues that arise with [his] children." *Id*.

As Joe's mother writes, he is "a great influence on his boys. He is a role model who has imparted his values of being caring, honest, loving, generous and responsible to his sons." Ad. Ex. 6 (███████ Letter). Joe's sons "are positive, intelligent, caring individuals. They are popular and many friends are always at their home. They are [] leaders and achievers and display many of the positive attributes of their father." *Id*. A friend of Joe's perhaps paid the truest testament to who Joe is as a father when he wrote Joe "is doing a very good job raising these boys to be men, in the best sense of that term – strong, gentle, considerate. They are a credit to the very best of Joe, and they have been resilient and [a] source of strength and support to everyone during this difficult time. . . . [T]heir potential to do good in this world is boundless." Ad. Ex. 23 (███████ Letter). As Joe's ███████ son ███████ wrote: "My father taught me to care for my family, love my family, and do everything in the name of my family. 'Never say the word *hate* to your family,' he would say. 'Melis always play on the same team.'" Ad. Ex. 24 (███████ Letter).

Friends and community members alike describe Joe as an "exemplary" father, whose "focus and devotion to those 4 boys is actually an inspiration" and "not just wordplay. I often

look back at the dedication and love and the accessibility that Joe gives to those boys of himself and I look to model myself as a father in the same mold." Ad. Ex. 25 (███████  ███████ Letter). Joe's "consistent, stern but loving discipline and lessons have fostered a band of brothers unlike any other that I have seen or heard of.  The Meli boys are the most affable, loving, personable, successful, happy children." Ad. Ex. 1 (█████  █████ Letter).  A friend with her own young children wrote that she "always use[s] █████ and █████ as examples of how to behave in various situations, using them to show my boys what honor, good manners, and good sportsmanship look like." *Id.*  Another friend relayed that:  "Joe has always taught his sons what is right and what is wrong and his bond with them is something I have wished to emulate with my own children." Ad. Ex. 19 (█████  █████ Letter).  "The Meli children are polite, loving, respectful and considerate beyond their years.  They absolutely take their cues from their father." Ad. Ex. 20 (█████  █████ Letter).

At their bar mitzvahs, Joe's "boys wanted everyone to know how much they love their father, how much they value his involvement in their lives, how much they believe in him and trust him." Ad. Ex. 3 (█████  █████ Letter).  One friend recalled that during █████ bar mitzvah, "you could feel the love and support in the room when Joe stood up to give his speech. There was not a dry eye in the place as Joe's words showed his humility, humanity and understanding of the choices that we make." Ad. Ex. 21 (█████  ███████ Letter).

One friend relayed a story in which █████ was not being nice to █████ Instead of passively telling █████ to knock it off, Joe took █████ aside and talked to him about what it feels like to lack your brother's support.  "He told him that brotherhood is THE DEEPEST BOND and that he had NO tolerance for being unkind to another person." Ad. Ex. 1 (███ ███████ Letter).  Another friend, a single mom, relayed that her son "has said more than once

11

that he wishes that Joe were his dad.  I think that is a testament to who Joe is as a father, husband, and person."  Ad. Ex. 21 (███ ███████████ Letter).

Joe's "boys are at an age when Joseph plays a vital role in their lives."  Ad. Ex. 3 (████████ ███████ Letter).  "His children need him as they are growing during these crucial teenage years."  Ad. Ex. 26 (██████ ████████ Letter).  "There may be only one person who we hold responsible for a crime, but in reality there are always many more who pay the price - most especially their children."  Ad. Ex. 27 (████████ █████████ Letter).  "When I think about a possible sentence for Joseph Meli that would potentially take him away from his family, my immediate thoughts go to his four sons, who are all at different developmental ages with different parental needs."  Ad. Ex. 1 (███ ███████████ Letter).

"These boys have an unbelievable connection and bond with their incredible father, and I feel that it would be a travesty to have them endure some of these challenging years (from ████ inclusive) without their incredible father figure in their home, modeling good behavior and family values.  I think ultimately the children would suffer unduly if Joe were to spend time away . . . [and] the implications of this would have deep seated, negative implications for the family as a whole."  *Id*.  Another friend echoed that he "cannot imagine the devastating impact a prolonged incarceration will have on these boys – their father has always been the center of their universe – they cannot afford to lose him in this critical time in their lives."  Ad. Ex. 19 (████ ████ Letter).  "Given the age of his boys, if Joseph were not actively involved in the daily lives of his four sons, it would be so tragic. . . . They depend on his guidance and look to him for direction."  Ad. Ex. 3 (████████ ███████ Letter).  "[W]ith not just one, but six lives hanging in the balance . . . the highest good in this situation would be served through very compassionate sentencing."  Ad. Ex. 2 (██████ ████████ Letter).  As Joe's sister wrote:  "I hope that somehow

12

this experience doesn't destroy the character, ethics and future of four boys who see their dad the same way his little sister got to see him." Ad. Ex. 9 (████ ████ Letter). "He is the primary positive influence in their life." *Id*.

**B.** **Joe Has Lived a Life of Generosity**

Joe is a man who provides gracious, unfailing emotional support for those whom he loves. He is the friend that people turn to when facing marital or familial strife, and the first call they make after unspeakable loss. Joe's capacity to give so much attention, love, and support to others — regardless of any issue he is personally facing — is a trait his friends consistently speak to in their letters of support. Joe "represents empathy in all that he does." Ad. Ex. 18 (████ ████ Letter).

Throughout Joe's childhood, the family moved frequently because his father's job required it. PSR at ¶ 61. Between grade school and middle school, the Meli family lived in four different cities: Fairfield, Connecticut; Salt Lake City, Utah; Cleveland, Ohio; and Minneapolis, Minnesota. *Id*. While many children would struggle with such frequent moves, Joe made the best of the situation. He drew on his congenial personality to transition to new schools. He made friends quickly, was close with his family, and enjoyed school. *Id*. While this constant uprooting was difficult for Joe as a boy and formed deep-seated fears of loss and instability, it also resulted in a warm, considerate personality that was certainly "shaped by the fact that he had to repeatedly make new friends." Ad. Ex. 28 (████ ████ Letter). "Joe has a wide circle of friends whom he treats as family. He loves bringing people from all parts of his life together. He is truly one of the most inclusive people I've ever known." Ad. Ex. 12 (████ ████ Letter).

From an early age, Joe showed the core personality traits that define who he is to this day — generosity, concern for other people, kindness, and inclusiveness. His friends recall that Joe

had an uncanny ability to make others feel welcome and included.  "As an introverted person, I always admired and appreciated Joe's innate sense of inclusiveness and his ability to make outsiders feel at home."  Ad. Ex. 27 (█████ █████ Letter).  "Joe has a unique way of making the people in his life feel important, as I discovered [on my twelfth birthday] and would experience countless more times over the course of three decades."  Ad. Ex. 23 (█████ █████ Letter).  █████ █████ wrote that, since the day he met Joe in seventh grade, he has "yet to meet a kinder, warmer, more generous or loyal friend."  Ad. Ex. 28 (█████ █████ Letter).  Another childhood friend recalled "that Joe has always had a gift for seeing the magic and good that's latent in a person or a situation that others might not grasp yet.  But what is so rare and special about Joe is that not only can he see it, but he also has the confidence and the courage to act on that vision, in a way that helps to actually manifest it in the world!"  Ad. Ex. 2 (█████ █████ Letter).  Joe's younger sister, █████ explained that Joe "still has friends from everywhere we lived.  I remember my brother helping his friends through everything – break-ups with girlfriends, parents going through divorce, anything a friend needed he would be there for support and would encourage my parents and I to help."  Ad. Ex. 9 (█████ █████ Letter).

Joe's altruistic heart, which so many who know Joe describe as his defining characteristic, continued to shine through as he became an adult.  It's what lies behind Joe's tremendous empathy and concern for all of the people around him.  Some people perform acts of charity for strangers.  Joe Meli has performed extraordinary acts of loving kindness to all of the people he has come across in his life — strangers, friends, and family alike.

Joe "stepped in as a father figure" for his younger cousins, █████ and █████ █████ after his uncle, their father, suddenly passed away.  Ad. Ex. 29 (█████ █████ Letter).  When Joe's █████ █████ ████████████████████████, Joe dropped everything to help.  "He devoted three

14

solid days to nothing but making sure that ▮▮▮▮ had proper immediate supervision, and requisite legal, therapeutic and financial support."  Ad. Ex. 4 (▮▮▮▮ ▮▮▮ Letter).  All of ▮▮ ▮▮▮▮ expenses were fully paid for by Joe, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  As Joe's aunt ▮▮▮ explained, in the depths of the darkest days, Joe "was the light in our life for which I am forever grateful."  Ad. Ex. 30 (▮▮▮ ▮▮▮ Letter).  Because Joe's uncle died without an insurance policy, the family faced a new life with incredibly limited income.  *Id*.  Joe functionally stepped in as a parent, paying for ▮▮▮▮ college tuition in 2008, ensuring ▮▮▮▮ "received the professional help and counseling he needed" after suffering emotional difficulties in the wake of his father's death, and acting as a consummate source of support and guidance for ▮▮▮▮  *Id*.

Joe's genuine concern for the wellbeing of everyone in his life means that he is the friend people turn to when in the grips of crisis.  ▮▮▮▮ ▮▮▮▮ credited Joe's heartfelt advice as the force which emboldened her to reunite with her estranged family:  had "it not been for Joe, I cannot honestly say whether I ever would have reunited with my family."  Ad. Ex. 26 (▮▮▮▮ ▮▮▮▮ Letter).  Even in the early stages of a friendship, Joe is a reliable, devoted friend who strives to ease others' suffering.  As ▮▮▮▮ ▮▮▮▮ wrote, "[s]hortly after meeting Joe, I went through a divorce.  Joe, someone I had just met, was the person who made time in his busy day/night to meet/talk/give the biggest hug."  Ad. Ex. 18 (▮▮▮▮ ▮▮▮▮ Letter).

Joe's warmth and generosity extends to anyone who crosses his path, including total strangers.  When ▮▮▮▮ ▮▮▮▮ a pregnant resident in Joe's building, needed to haul a pediatric treadmill up to her apartment so that her ▮▮▮▮ young daughter could begin ▮▮▮▮▮▮▮, it was Joe who walked up to her on the sidewalk and assured her that he would get the equipment upstairs.  Ad. Ex. 22 (▮▮▮▮ ▮▮▮▮ Letter).  Joe's act of kindness toward a

stranger was the seed that sprouted a rich friendship between the two families, with ████

explaining how she has watched Joe's sons adopt their father's kind spirit, evinced this past

October when Joe's young son asked how he could "make Halloween more fun" for her ████

daughter.  *Id*.

Joe, who quietly fought cancer himself, has taken it upon himself to organize fundraising

efforts for people in his community who were sick with cancer and did not have access to wealth

of financial resources.  "When [Joe's] ████ ████ ████ was dying of cancer, Joe and

his family held a 'Support ████ bake sale ████ to raise money."  Ad. Ex. 31 (████

████ Letter).  The Meli-led bake sale allowed ████ to care for himself after he became too

sick to work.  *Id*.  ████ ████ a leasing manager for apartment buildings, explained that "Joe's

consideration for people he does not answer to goes far beyond nuanced manners" and that

"Joe's kind personality is not a businessman's façade but the natural result of a caring heart.

Anytime he sees a porter or handyman in need, Joe offers help without expecting anything in

return."  *Id*.

Joe also took the initiative to create a fundraiser for ████ ████ a young

teacher at his sons' school who was battling cancer, which "raised over $200,000" and afforded

████ "treatment that granted her many more precious days on Earth."  *Id*.  As ████ mother

wrote, Joe's support went beyond raising money for ████ treatment: "Joe always looked out

for ████ wellbeing, often asking if there was anything she needed or anything he could do to

make life easier.  Joe did this without asking or expecting anything in return.  He showed only

kindness to ████  Ad. Ex. 32 (████ ████ Letter).

Joe has "always felt responsible for those around him, be it friend or family.  He always

wants everyone to be included . . . He is the champion of the underdog and is always willing to

help anyone with anything."  Ad. Ex. 5 (██████ ███ Letter).  "Joe reflexively, invariably . . . rushes to the defense of underdogs – because he can't help but feel and act on behalf of those who may be distressed or maligned."  Ad. Ex. 17 (█████ ████ Letter).  ██████ ████████ wrote that "Joe was the first person" he called after the passing of his father, and explained how when Joe visited for the funeral, "without any prompting" Joe took ████████ ███████ daughter to the American Girl Doll store a few days into the visit "so she could get away from all the grieving that we were going through."  Ad. Ex. 28 (██████ ███████ Letter).  ███████ ████ Joe's older sister ██████ employer, wrote that Joe was a consummate vocal advocate for marriage equality and "an ally in times when it wasn't the popular opinion."  Ad. Ex. 7 (██████ ████ Letter).  When ██████ and his husband adopted a little boy, ██████ recalled that "Joe was one of the first to welcome our son into our lives and let us know that the Meli family grew the day we finalized ████████ adoption."  *Id.*

Joe is also the friend that opens the doors of his home to those with no place to go. ████████ ████ described how after Joe heard that █████ and his family "had no place to celebrate the Jewish Holidays," he called and invited them "without hesitation or fanfare" to spend it with the Melis.  Ad. Ex. 15 (██████ ████ Letter).  When "Thanksgiving rolled around, once again, Joe opened his home to my family."  *Id.*  Joe's neighbor wrote that "[t]heir home is full of love and their door is always open.  This is because of Joe."  Ad. Ex. 22 (██████ ████████ Letter).

## II.     **The Aberrational Nature of the Offense**

The Government has characterized Joe's conduct as a classic "Ponzi scheme," in which Joe created a "fictitious business."  The offense conduct is more complex and nuanced than that. Joe did not intend to steal from his investors.  Prior to his arrest, Joe had been in the live-event business for more than 15 years, with a years-long track record of success for his investors.  This was a real business – not a fake business.  As explained below, the written agreements Joe

provided his investors did not convey the full truth.  Joe has pleaded guilty and deeply regrets those actions.

### A.      The Indictment and Guilty Plea

Counts One, Two and Three of the Superseding Indictment charged Joe and Steve Simmons (a man Joe had never met until the day he was arrested) with conspiracy to commit securities fraud and wire fraud, and the related substantive counts, in connection with Mark Varacchi's Sentinel Growth Fund Management ("Sentinel") fraud.  Joe pled not guilty to those counts, and the Government has agreed to dismiss them.  As explained below, we do not believe that allegations related to the Varacchi/Sentinel Ponzi scheme are accurate as they relate to Joe and, in any event, should not be considered "relevant conduct" for purposes of Joe's sentencing.

Count Four charged Joe alone with wire fraud, in connection with his ticket reselling business, and Count Five added a securities fraud charge, covering the same conduct.  Count Six charged Joe with Aggravated Identity Theft, in furtherance of the wire fraud scheme alleged in Count Four.

While many of the Government's allegations in this case were not accurate, it is true that Joe provided false documents to investors to make it seem as if he had a contractual right to obtain certain tickets, when that was not true.  This wrongful conduct is at the heart of his crime, for which he pleaded guilty and has expressed remorse.  Joe is embarrassed by this conduct and deeply sorry that he misled his investors with these letters.

On October 31, 2017, Joe pleaded guilty to a single count of securities fraud, Count Five of the Superseding Indictment.  PSR ¶¶ 10, 38.  ███████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████

After his plea, the Government continued to portray Joe as nothing more than an operator

of a Ponzi scheme:

> As he admitted in court today, Joseph Meli created his own
> theatrical production — a fictitious business that purported to have
> access to blocks of tickets to Broadway shows and other events.  In
> fact, Meli was deceiving investors into giving him money that he
> pocketed to fund his own extravagant lifestyle.  Now he awaits
> sentencing for running a Ponzi scheme.

*See* Ex. AA (Press Release, U.S. Attorney's Office, S.D.N.Y., *Manhattan Man Pleads Guilty To*

*Participating In Multimillion-Dollar Securities Fraud Scheme* (Oct. 31, 2017)).[5]

To Joe, these statements were absolutely devastating.  His business operated on

handshakes, on trust.  He had spent a lifetime cultivating a reputation for honesty and integrity,

both in his personal life and in his business.  While he knew he had violated the law, his business

was not "fictitious."  He had been running a real business, not making up deals "out of whole

cloth."  His sudden arrest and public condemnation created a news frenzy that quickly

exaggerated Joe's crime.

---

[4] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

[5]      At the time the Indictment was returned, the Government described the case in its
accompanying press releases as one involving a series of "Ponzi schemes."  The U.S. Attorney
announced that Steven Simmons and Joseph Meli "were in fact running Ponzi schemes.  Meli
allegedly made up out of whole cloth purported deals to buy Broadway tickets that he could later
sell at a profit."  Ex. BB, (Press Release, U.S. Attorney's Office, Southern District of New York,
*Two Individuals Arrested And Charged In Manhattan Federal Court With Securities And Wire*
*Fraud For Participating In A Multimillion-Dollar Ponzi Scheme* (Jan. 27, 2017)).

Despite the media frenzy, Joe resolved to accept responsibility for his wrongful conduct, and work to set the record straight and make amends for his wrongs. He "is fully aware of the repercussions of his actions, the mistakes he has made, the amends he must make." Ad. Ex. 23 (████ ████ Letter). As those close to him can attest, "Joe accepts his role in the acts that transpired, and he will spend the rest of his life trying to undo those wrongs." Ad. Ex. 33 (████ ████ Letter). Joe "has expressed his regret and remorse for his actions each day." Ad. Ex. 34 (████ ████ Letter). He has expressed to loved ones "that he regrets the mistake he made and knows that he will spend the rest of his life living with and trying to make up for it. This experience has already humbled him." Ad. Ex. 35 (███ and ████ ████ Letter). "He clearly feels a sense of responsibility and remorse for the mistakes that he did make." Ad. Ex. 28 (████ ████ Letter).

Since his arrest, Joe also has sought to gather available funds to make full restitution to his investors.[6] Furthermore, in connection with his submission to Probation and Pretrial Services, Joe undertook a comprehensive accounting of his assets and submitted a detailed inventory of all his assets available for restitution. That analysis indicates that Joe has significant assets, valued in the tens of millions, both liquid and illiquid, that he intends to use for restitution. Pursuant to the PSR, the Government is seeking forfeiture and restitution in the amount of $58,777,813. PSR ¶ 8. Given his current circumstances, it may be difficult to recover some of the funds identified. However, within 90 days of sentencing, consistent with 18 U.S.C.

---

[6]     As of February 28, 2018, since the time of his arrest, Joe has recovered $268,872.89 from various live event ticket-related investments. That money has been deposited in an escrow account with the Court authorized by Judge Stanton in connection with *Securities and Exchange Commission v. Meli*, 17-cr-632 (S.D.N.Y.) (ECF No. 133).

§ 3664(d)(5), Joe intends to develop an appropriate restitution plan and to help the Government collect all available assets so that restitution may be fully made.

Joe's guilty plea to one count of the Superseding Indictment represents full acceptance of responsibility for his criminal conduct.  ████████████████████ to collect assets also reflect Joe's desire to begin to make amends for his actions.  And his acceptance of responsibility saved the Government substantial time and resources.

III.    **The Federal Sentencing Guidelines Substantially Overstate the Seriousness of Joe's Offense and a Non-Guidelines Sentence is Warranted**

For the reasons set forth below, we respectfully submit that each of the sentencing factors this Court must consider under 18 U.S.C. § 3553(a) weighs in favor of leniency.

A.    **Legal Standard**

In determining an appropriate sentence, the Court's fundamental task is to "impose a sentence sufficient, but not greater than necessary," to achieve the specified purposes of sentencing.  18 U.S.C. § 3553(a).  In determining that sentence, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," along with a series of additional factors set forth in the statute.  *Id.*

While the Court must consider the sentencing range set forth in the advisory Sentencing Guidelines, "[i]t is now, however, emphatically clear that the Guidelines are guidelines — that is, they are truly advisory," and that sentencing judges are "generally free to impose sentences outside the recommended range."  *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).  In imposing sentence, district judges may take "full account of the history and characteristics of the defendant," *United States v. Peacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring), and consider "the judge's own sense of what is a fair and just sentence under all the circumstances."  *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

**B.      The Guidelines Calculation**

The Guidelines applicable to Joe's offense are set forth in the November 1, 2016 edition.
The applicable offense guideline provisions is U.S.S.G. § 2B1.1 (fraud).  Under § 2B1.1, the
base offense level is 7.  Pursuant to § 2B1.1(b)(1)(L), Joe's offense level is increased by 22
levels because the offense involved more than $25,000,000 but not more than $65,000,000 in
"loss."  Pursuant to § 2B1.1(b)(2)(A)(i), Joe's offense level is increased by 2 levels because the
offense involved 10 or more victims.  With credit for acceptance of responsibility, a 3-level
reduction is warranted.  § 3E1.1(a), (b).  Accordingly, the adjusted offense level is 28.  With no
criminal history points, Joe falls within criminal history category I.  These calculations yield a
Guideline ranges of 78 to 97 months' imprisonment.

In the PSR, the U.S. Probation Department rejected the Guidelines recommendation,
which generated an unreasonably severe prison sentence.  Instead, the PSR proposed a non-
Guidlines sentence of 54 months.  While we agree that a non-Guidelines sentence is appropriate
here, given the unreasonably harsh calculation, we submit, for the reasons set forth below, a
non-Guidelines sentence not to exceed 21 to 27 months, with some of that time possibly
substituted by home confinement and community service, is just.  That sentence is substantial
and commensurate with the nature and seriousness of Joe's offenses, but is "no greater than
necessary" to achieve the specified purposes of sentencing.

**C.      The Nature and Circumstances of the Offense**

The first factor the Court must consider is "the nature and circumstances of the offense."
18 U.S.C. § 3553(a)(1).  As explained, Joe Meli did not operate a fictitious business.  He did not
make up transactions "out of whole cloth."  As he admitted in his plea, Joe provided "false
documents" to some of his investors, but not because the underlying transactions for which he
accepted investments were not real.  Joe used the letter agreements:  (1) to compensate for the

22

fact that the underlying ticket transactions were negotiated informally, without documentation, and (2) to protect the anonymity of the true sources of his ticket inventory. These misrepresentations, while material, did not go to the basis of the investors' bargain; rather, they were inducements that were collateral to the fundamental terms of the deal. *Cf. United States v. Starr*, 816 F.2d 94, 98-100 (2d Cir. 1987) (discussing *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)). Joe's use of these falsified letter agreements is neither indicative of any intent to harm his investors, nor to benefit at their expense. They were a misguided – and illegal – technique for closing a deal, but not a fundamental lie about the existence of the deal in the first place.

### 1.   Joe's History and Background in the Entertainment Industry Led Him to Create his Ticket Reselling Business

For the 15 years prior to his arrest, Joe worked tirelessly to develop a series of businesses in the music and entertainment industries. He became regarded as a world-class concert producer and promoter. Former colleagues described Joe with glowing language, calling him a "great businessman who possess[es] talent you can't learn at Harvard Business School." Ex. A (Investigative Due Diligence Report at 47). Joe's success was the result of hard work. Joe "worked very, very hard over a decade or more to build his ticket re-selling business. There were many nights when he'd be out late with clients, and then be up and on the phone at 6:00 am the next day, continuing to conduct business." Ad. Ex. 4 (████████ ████ Letter).

By the middle of 2003, at the age of 29, Joe developed an idea to "create the ultimate concert experience" and started to develop the concept as the CEO of Bulldog Entertainment Group. PSR at ¶ 90. Joe identified "the need to experience live events different[ly]" and built a unique VIP concert experience for music fans. Ex. B (Jennifer Gould Keil, *Joe Concert Ups rock tickets to $15,000*, N.Y. POST, June 10, 2007). Joe's new business venture involved

23

creating concert packages for customers, entertaining clients with premium tickets (in the first 10 rows) to live events, limited edition merchandise, backstage passes, and access to performers. PSR ¶ 90. Joe worked with sponsors, radio programs, and record labels to secure optimum artist engagement. Bulldog's artists included Madonna, U2, The Rolling Stones, and Justin Timberlake. Ex. A (Investigative Due Diligence Report at 34). He marketed the VIP experience to "hundreds of corporate clients," including prominent credit card companies. *Id.* This "ultimate concert experience" — more than just a good seat — allowed Joe to charge more than the face value on the ticket, providing a product that had previously been unavailable. *Id.*

After several years, the concept culminated in Joe's creation of a bespoke concert series. Bulldog created a season ticket to concerts by Prince, Billy Joel, Dave Matthews, Tom Petty, and James Taylor. Ex. B. This concert series involved not only live-music, but also art exhibitions, celebrity chefs, and magic performances. Moreover, at Joe's insistence, a share of the proceeds generated by this concert series — approximately $2 million — was donated to the Ross School's scholarship fund. A public relations executive declared the series to be the best event she had ever promoted. Ex. A (Investigative Due Diligence Report at 46). Other sources proclaimed Joe's execution to be "top notch," and noted that he "always took care of his employees." *Id.* at 44-45.

This concert series earned Joe notoriety in the music business, and helped him sell his business to the Warner Music Group for approximately $18 million. PSR ¶ 90. Joe became Warner's Senior Vice President of U.S. Recorded Music. Ex. A (Investigative Due Diligence Report at 35). Although Joe was offered another executive position, he left Warner around March 2008. *Id.* Despite his relatively brief tenure, Joe made a tremendous impression at Warner. Executives remembered Joe as a "visionary," "super creative," a "courageous guy with

a solid business mind." *Id.* at 45.  Joe "had the ability to create things when most people would

walk away; he "enters and succeeds in businesses most people don't understand." *Id.*

Shortly after selling his company to Warner, Joe was required to enter into a three-year

non-compete agreement.  PSR ¶ 90.  Unable to work in the concert space, Joe began looking for

other opportunities in the entertainment industry he knew so well.  He connected with his

lifelong friend, ███ ████ who was also, at that time, looking for a new venture in the

entertainment space.  ████ had a background in finance and knew of a London-based

institutional asset management firm that was interested in investing in the entertainment

ventures.  Ad. Ex. 23 (███ ████ Letter).  Joe contacted ████ ███ whom he knew well

from the concert business.  ████ around the same time, was stepping down from his role as the

head of ██████ Together, ███ ███ and ████ formed a specialty finance company

called Stage Capital Partners "to explore different live event experiences," including soccer

games in England and Broadway shows.  PSR ¶ 89.

From 2010 through 2012, the company provided "forward financing" for live events

companies through the financing of ticket inventory and other related revenue streams.

PSR ¶ 89; Ad. Ex. 23 (███ ████ Letter).  For example, Stage Capital Partners provided

financing to the owners of an English Premier League football team, which was secured by

future revenues generated from the sale of season tickets.  The arrangement allowed the team to

secure a sizable amount of capital in advance, before the tickets were sold, which it needed to

finance aspects of its operations.  Over the three years it operated, Stage Capital Partners

completed transactions in excess of $100 million.  Ad. Ex. 23 (███ ████ Letter).

While his partners focused on other aspects of the business, Joe contributed by doing

what he knew best — building and managing relationships, largely in the entertainment and live

25

event industries.  *Id.*  His investors proclaimed that Joe had "incredible relationships in the industry."  Ex. C (AE Reference Call Notes (Aug. 9, 2016)).  Everyone from stagehands, roadies, and performers — "they all know Joe and like him very much."  *Id.*  Joe "ha[d] won the respect of people around him in this space."  *Id.*

During this period, Joe began working with Key Brand Entertainment, a United States-based investment firm, that had acquired Broadway Across America, the company that manages traveling tours of Broadway shows.  Ad. Ex. 23 (███ ███ Letter).  Like the English soccer team, Broadway Across America had expectations of future revenue streams from the sale of tickets, for which it sought forward financing.  With Stage Capital Partners, Joe arranged that financing and structured the deal.  Ultimately, Key Brand Entertainment used the financing arranged by Joe and his partners to acquire Broadway.com, the primary online ticket platform for all Broadway shows.

Despite these substantial successes, by 2012, Stage Capital Partners had run its course.  Changes in English tax law meant that the London-based asset management firm that provided it with capital could no longer invest in the United States.  As a result, Joe began looking for new sources of financing for the sort of creative deals he had become an expert at structuring.  This effort led to his creation of Advance Entertainment.

### 2. In 2011, Joe Founded his Ticket Reselling Business: Advance Entertainment

Joe founded Advance Entertainment in 2011, with a view towards structuring the same type of transactions that he had done with Stage Capital Partners, *i.e.*, forward financing of

revenue streams in the live event space, typically secured by the sale of tickets, but with a domestic source of capital.  PSR ¶ 88.[7]

Initially, Joe struck a deal with the private investment group of a major New York investment firm.  Shortly after the deal was struck, however, the firm closed its private investment group, and assigned Joe to work with its credit investing team.  The firm instructed Joe to use his relationships and knowledge of the live event space to find financing opportunities, which the firm would then underwrite.  To Joe's great frustration, however, as he found these opportunities, it invariably turned out that the firm was unable to extend financing because the deals Joe sourced tended to function more like equity transactions, and did not meet the criteria of the investment firm's credit group.  Even more frustratingly, when Joe's principal investment backer declined to participate in a transaction, other investors typically walked away from the opportunity as well.  Accordingly, towards the end of 2012 and beginning of 2013, Joe cut ties with the investment firm and began looking for another way to finance his transactions.

Towards the end of 2013, while working with the investment firm on a $100 million transaction to finance the stadium tour of a major artist, the course of the negotiations led Joe to a key realization.  During the negotiations, the promoter offered to provide VIP tickets, which

---

[7]     As demonstrated by the hundreds, if not thousands, of relevant texts and emails produced in discovery, Joe has strong and deep relationships at every level in the music business.  Because of those relationships, Joe found himself able to arrange for the purchase of large blocks of premium tickets directly from venues, promoters, and artists' managers.  Joe's relationships in the industry provided Joe and his investors with access to tickets that other ticket brokers could not provide.  The investors' words speak for themselves:  Joe "knows every person in the industry."  Ex. C (AE Reference Call Notes (Aug. 9, 2016)).  His investors were amazed by "the range of people and how they view Joe."  Another investor marveled:  "I went to a couple concerts with him and saw how he networks."  *Id*.  Joe "has won the respect of people around him in this space."  *Id*.  Over time, new investors came to "understood how the relationships and the ticket sales happen" and "met all the people."  *Id*.  An investor explained:  "Spend a week with [Joe] and you will understand all of this."  Advance's success was built on these hard-earned relationships.  *Id*.  The greatest engine of these relationships was Joe himself.

could be re-sold at a profit, as one of the terms of the negotiation.  At that moment, realizing that

his work with the investment firm was coming to an end, Joe saw that he might be able to

structure smaller transactions, without the need for a large financial backer, by simply financing

the VIP tickets for a concert series or Broadway show, without having to underwrite the entire

production.  Joe decided, from that point, until he was able to find a large source of capital to

underwrite major transactions, he would keep his business afloat by arranging smaller

transactions to provide forward financing in exchange for blocks of VIP tickets to live events.[8]

Joe found that because of his varied and deep relationships throughout the music, finance, and

live entertainment industries, he often had multiple opportunities to obtain premium tickets.  He

simultaneously sought tickets to the same event from multiple different sources at the same time

– expecting that some sources would come through, while others would not.[9]  Joe worked

tirelessly to obtain as many tickets as he could, to provide returns to his investors.

---

[8]      For as long as the public has been attracted to attend live events, there has been a
secondary market in tickets.  It begins with the venues and/or promoters who control the initial
sale of tickets. As the New York Attorney General recently reported, based on a multi-year,
collaborative study:  "[t]he majority of tickets for popular concerts are diverted away from the
general public."  Ex. D (NEW YORK STATE ATTORNEY GENERAL, OBSTRUCTED VIEW: WHAT'S
BLOCKING NEW YORKERS FROM GETTING TICKETS 11 (2016)).  In fact, the Attorney General
found that "only about 46% of tickets are reserved for the public," with the remaining 54%
divided among "holds" for artists, venues, promoters and other industry insiders, and "pre-sales"
to groups and large businesses who resell those tickets to their customers.  *Id.*

[9]      For example, in one very well-documented exchange, Joe wired $600,000 from Advance
Entertainment to ▮▮▮▮ who purported in a series of emails and text messages to have
access to large blocks of Metallica tickets.  In August 2016, ▮▮▮ sent Joe a draft contract,
titled "Metallica Ticket Purchase for 2017 U.S. Tour."  Ex. E (E-mail from ▮▮▮ ▮▮▮ to
Joe Meli, titled "Give it a read?", attaching document titled, "Metallica Ticket Purchase for 2017
U.S. Tour" (Aug. 16, 2016)).  That draft contract conveyed that ▮▮▮ had the ability to
purchase "up to" 250,000 "premium" tickets for the tour "at an average price of 1.5 times face
value."  *Id*.  The contract further provided that "[i]f the assumptions hold the purchase payment
for all 250,000 tickets would be $46,875,000."  *Id*.  Joe believed that ▮▮▮ who had texted
him real-time updates about his various meetings with other music promoters and Metallica's
manager, ▮▮▮ ▮▮▮ regarding the tour, was genuinely seeking to procure — and had
procured — access to Metallica tickets.  *See* Ex. F (E-mail from ▮▮ ▮▮ to ▮▮ ▮▮
(Nov. 15, 2016)).  Despite dozens of detailed follow-up messages, an additional $500,000

For the next two to three years — roughly from 2014 through his arrest in January

2017 — Joe focused a substantial part of his efforts on finding smaller investors to finance

blocks of premium tickets to live events.  In doing so, he followed two core principles, which

explain much of the activity underlying the offense conduct in this case.  *First*, he consistently

eschewed having a single strand of financing, having learned from his experience with the

investment firm that relying too much on a single funding source could cripple his ability to do

business.[10]  *Second*, as reflected in the written funding agreements that Joe provided to his

investors, the investors would not be investing directly in a ticket transaction, but would be

advancing funds to Joe for his use in acquiring tickets.[11]  This is important, not least in terms of

Joe's state of mind with respect to these transactions.  Joe always believed that his investors

understood the inherent risks and were investing in him and his ability to source and re-sell

tickets, not in the transactions themselves.

Every investment in Advance Entertainment was made pursuant to a written funding

agreement, which specified that the investor was not investing directly in the ticket transaction

itself, but rather advancing funds to Joe, for his use in purchasing tickets in exchange for a right

to participate in the cash flow that resulted from the resale of those tickets.  In Joe's mind, so

long as he was in fact purchasing and re-selling tickets to the relevant events then he was living

---

investment from Joe, and a January 13, 2017 email in which ███████ confirmed that "we have all
the tickets ironed out (66,000) for the [Metallica] Stadium shows this summer and we will have
them listed on DTI ahead of the onsale next month" (Ex. G (E-mail from ████████ ████████ to Joe
Meli (Jan. 13, 2017))), ███████ never provided the tickets that he promised.

[10]    That is, as explained below, unless the single strand of financing was significant enough
to constitute a true equity partnership.

[11]    *See, e.g.*, Ex. H (Metallica Funding Agreement (Jan. 12, 2017)), which specifies in the
Recitals that "Investor desires to advance to Meli" a specified sum of money "to fund the
purchase of the Tickets by Meli in exchange for a sharing of proceeds from the re-sale of the
Tickets on the terms set forth herein."

up to the bargain he'd made with his investors.  However, because the ticket transactions were, as many investors well-knew, typically arranged verbally and consummated with cash, it was impossible for Joe to provide investors with the sort of documentation they sometimes requested. In addition, because Joe's ability to access tickets required him to maintain the anonymity of those from whom he received tickets, Joe could not identify the true sources of his tickets in writing to his investors.  Joe told his investors that they could not contact or vet his sources of tickets, and it was always clear that the investors were not parties to those letter agreements. Like any middleman, Joe concealed the true sources for his tickets from his customers, because his knowledge of those sources was the ultimate value he provided to his investors.  Had he disclosed the true sources of tickets to his investors, they could have cut Joe out of the transactions entirely.  Thus, the letter agreements served, among others, two purposes: (1) concealment of the true ticket sources and (2) providing documentation for what were actually verbal agreements.

It does not follow, however, from the fact that those letter agreements were not authentic, that Joe did not buy and sell tickets to the relevant live-events.  As shown by the emails and text messages produced in discovery, Joe was negotiating daily with the heads of live event companies, artists' managers, and others to obtain the tickets he said he'd obtained.  While he did not always obtain those tickets from the sources identified in the false letter agreements, Joe usually was able to obtain the tickets.  Joe fully accepts responsibility for using fake letter agreements.  But, that does not mean he operated a Ponzi scheme in the sense that the ticket transactions were fictitious; his business was buying and selling tickets and the ticket transactions, more often than not, did occur.[12]

---

[12]     The Government suggests Joe's business was not real because Joe was still seeking to buy tickets after providing the letter agreements to his investors.  PSR ¶ 25.  But, again, that does

Joe never marketed this investment opportunity to the public.  He only marketed it to

people he knew, and people to whom he was introduced for investment purposes.  Generally, Joe

marketed this opportunity to wealthy individuals who could afford to invest in such a high-risk,

high-reward venture.  On occasion, when he either did not have a ticket deal available, a ticket

deal was oversubscribed, or a potential investor seemed uncomfortable with the structure, Joe

declined to accept proposed investments.  Over the course of many years, Joe led many

successful investments, with investors receiving what they were promised and the corresponding

returns.

As described *infra*, in connection with an equity investment it had made in Joe's

business, a large private equity firm conducted extensive due diligence on Joe's business and

spoke with several happy investors.  These investors characterized Advance Entertainment as "a

very fruitful endeavor" with "successful investments."  Ex. C (AE Reference Call Notes

(Aug. 9, 2016)).  One investor commented that he was "very satisfied and happy" with the "one-

off ticketing opportunities" — "otherwise, I wouldn't still be doing it."  *Id*.  Another indicated

that "you can make 50-100% gross return over a 3-6 month period."  *Id*.  Another investor

earned $3 million in profit over four months in a Grateful Dead ticket transaction.  *Id*.[13]

---

not mean he had not obtained tickets at the time he represented that he had to investors; it simply
means that, Joe worked tirelessly to obtain as many tickets as he could from all available sources.

[13]    Despite Advance Entertainment's success, one theme echoed among Joe's investors:  his
lack of infrastructure.  Some investors complained that "it's tough to illustrate how compelling
his opportunities are" since he "doesn't have financial statements."  Ex. C (AE Reference Call
Notes (Aug. 9, 2016)).  Joe "may not be as organized as you'd like."  *Id*.  Numerous investors
identified the "big need" as "more professional infrastructure."  *Id*.  Two recommended "a CFO
and financial analysis team to complement his opportunity hunting."  *Id*.  After all, "his contacts,
his relationships" were "what he does best."  *Id*.  Professional infrastructure would permit Joe "to
fully take advantage of his relationships and skills."  *Id*.  His investors in Advance understood
that Joe "need[ed] infrastructure" and was overwhelmed by the task of running a multi-million
dollar business, effectively by himself, day-to-day.  *Id*.

### a.   Joe's "Cash Problem"

Joe's biggest challenge in this phase of his career was neither finding investors nor sourcing tickets.  The biggest challenge was handling the cash generated by his business.  Because the people who sold tickets to Joe often offered tickets under conditions of anonymity, for a variety of reasons, the transactions were arranged on a verbal or handshake basis, and the sellers typically insisted on being paid in cash.  While each transaction worked somewhat differently, Joe typically negotiated the deal terms and had a trusted broker deliver the agreed-upon cash in exchange for tickets.  Once the tickets were obtained, brokers would sell those tickets on the secondary market to maximize returns.[14]  Almost always, the proceeds of those secondary market transactions were remitted to Joe in cash, and that cash would either be delivered by brokers to Joe, or held by those brokers on Joe's behalf for use in a subsequent ticket transaction.[15]

---

[14]   For example, Joe held a conference call in 2015 to explain to investors how his ticket business worked in connection with Dead & Co.'s then-current tour.  Joe explained that he had only purchased tickets in certain cities where he had a broker network, that he had paid double the face value to purchase specific tickets where he knew he could secure a premium in excess of that price, and that he would buy additional tickets in some tour cities, but not in others.  Joe explained that he did not buy or sell tickets in Albany, for example, because he did not know the local marketplace.  Joe's investors understood and endorsed his approach to the Dead & Co. transaction, participating in subsequent live-event ticket ventures under similar terms.  *See* Ex. I (2015 Dead & Co. Investor Conference Call, including Joe Meli and David Molner).

[15]   While some people decry the existence of "ice" and sales to ticket brokers, there are reasons that this practice has existed for centuries and continues to exist today.  *First*, it provides a form of "forward financing" for artists, promoters, and venues, which typically face large up-front costs for staging a production, knowing that they would not collect on that investment for months, if not years, as tickets are gradually sold.  *Second*, it allows artists and promoters to collect something close to what the market will actually bear for their performances, while keeping stated prices at a point that will not offend portions of their ever-growing fan base.  In any event, however one comes out on the question of "ice" and the existence of a secondary market, Joe did not create this system, and it certainly did not end with his arrest.  In fact, prior to his arrest, Joe had devoted much of his time towards developing a business that would make the sale of tickets more transparent, and would align fans, rights holders, and talent.

The problem was that most of his investors provided their investment funds by wire transfer and expected to receive their investment returns by wire transfer.  As a result, Joe often used funds he received by wire transfer from one investor to repay other investors, because newly invested funds were one of his only sources of wire-able funds.  At the same time, however, in parallel, he conducted most of his business operations using cash.

Joe made no secret of his use of cash.  He fully disclosed it to the private equity firm when they were working on an investment in his company.  He paid some of his investors out in cash, as evidenced by text messages produced by the Government, and offered to pay many more in cash.  In November 2016, Joe reached out to a partner at a prominent Manhattan law firm "looking for a low-cost, efficient and highly-reputable way of banking his cash proceeds from the sale of Hamilton tickets."  Ex. J (E-mail from Joe Meli to ▇▇▇ ▇▇▇▇ (Nov. 14, 2016)). Joe also explained his use of cash when communicating with his investors. After an investor asked Joe about an investment in a block of *Hamilton* tickets, Joe related:  "I have collected money and have them converting it from cash to wirable capital."  Ex. K (Text Message from Joe Meli to ▇▇▇▇ (June 15, 2016)).  On some occasions, investors agreed to accept cash payments from Joe.  One investor texted Joe:  "Should I get the cash from you on Monday?"  Joe responded:  "That works great.  $200k correct?"  Answer:  "Yeah."  Ex. L (Text Message correspondence between ▇▇▇ ▇▇▇ and Joe Meli (Nov. 18, 2016)).  A different investor wrote:  "I'm going to talk to my advisors about taking cash."  Ex. M (Text Message from ▇▇▇ ▇▇ to Joe Meli (Nov. 16, 2016)).  In one email with the subject line of "Hamilton $$," Joe sent Matt Harriton a photograph of a black duffel bag, packed with more than five, upward-facing thick bands of $20 bills.  Ex. N (E-mail from Joe Meli to Matthew Harriton (Sept. 1, 2016)).

These five bands were surrounded by more rubber-banded stacks, each approximately one inch thick.  And this is just one example.

To the extent the Government points to the use of funds raised from one investor to repay another,[16] that fact is explained by the cash nature of the ticket transactions.  As described above, sources of tickets typically insisted on being paid in cash, and brokers who sold those bulk tickets were also paid in cash; despite his efforts, Joe had no ready way of converting his cash into an asset that could be deposited into a bank.  Accordingly, when the time came to repay an investor with a wire transfer, Joe used the wired funds he received from later investors.  All the time, however, cash transactions were occurring in parallel to buy and sell tickets to live events.  Given the context of the business, that the Government saw investor funds arrive in Joe's bank account, and then be immediately wired out to other investors was not proof that Joe was operating a "fictitious business."  Rather, it was evidence that Joe ran a highly unconventional business that typically was conducted using cash transactions.  Stated differently, the Government's case was made by analyzing only one-half of Joe's ledger – wire transfers – while wholly ignoring the substantial cash component of how Joe's business operated.  That one-sided analysis led the Government to reach incorrect conclusions concerning the scope of the conduct at issue.

### 3.      Joe Had a Larger Vision for the Secondary Ticket Market

The whole time Joe was raising capital in this manner (largely between 2014 and 2016), Joe never gave up on the idea of finding a large, stable source of equity financing that might support his larger vision for how to provide secure, forward financing to participants in the live

---

[16]      *See* Complaint ¶ 23 ("Based on my review of records for the Meli Company Account, none of [the funds raised from a particular investor] were, in fact, utilized to purchase tickets to the Show or any other live events.")

event industry.  That vision appeared to be within reach in April 2016 when Joe learned about a company called DTI, which owned a proprietary technology that allowed brokers to post tickets for sale directly to fans on 1,800 market places simultaneously.  DTI's technology was, essentially, a broker management tool, which allowed the company to track purchase and sales and, perhaps most important for Joe, it provided the ability to collect electronic payments directly from consumers.  Joe learned of DTI from a senior executive at one of the largest concert promotion companies in the world.  Upon hearing about DTI, Joe arranged to meet, the same day, with DTI's CEO.  By August, Joe had struck a deal, merging Joe's business gathering tickets to be sold on the secondary market with DTI's broker management tool.

The vision behind this merger was profound — it would have allowed Joe to provide forward financing to promoters, venues, artists, and their managers by buying premium tickets in advance, and then sell those tickets directly to fans at premium prices without having to deal with the network of brokers, and their demands to conduct business in cash.  The idea was to bring transparency into the secondary market for premium tickets.[17]  Joe envisioned that this combination would create an established, transparent secondary ticket market online and formalize the well-documented centuries-old secondary ticket market sales so that it would become an accepted norm and so that the proceeds would flow to the artists and to the venues.

Around the same time Joe arranged this transaction, he secured what looked to be a stable source of equity capital for large-scale investments; namely, a large, well-respected private equity firm with approximately $80 billion under management (the "Private Equity Firm").  Joe presented his vision to the Private Equity Firm and, after conducting due diligence on the

---

[17]    To the extent artists would resist charging premium prices to their fans, DTI would allow artists to demonstrate that premium prices paid for certain tickets allowed artists to charge lower prices to other fans for non-premium tickets.

business, the Private Equity Firm agreed to finance the transaction.  It made a substantial equity investment in DTI, and installed Joe as the co-CEO of DTI.  Joe still needed to raise capital on his own to finance the purchase of inventory because the Private Equity Firm would only commit additional funds for that purpose in exchange for larger and larger pieces of equity.  But Joe believed he could raise the capital on his own, as he always had, from his own network of financiers and other fund-raising partners who, in turn, identified sources of capital.

In Joe's mind, this was to be the apex of his career.  Joe was actively negotiating deals with the heads of ███ and █████████, the two largest promoters of concerts in the world.  *See*, *e.g.*, Ex. O (Text Messages between Joe Meli and ████ █████ (██████████████ ████) (Nov. 7, 2016 to Jan. 27, 2017)).  As is clear from the correspondence, Joe's goal was to purchase premium tickets directly from these promoters to post those tickets for sale directly on the DTI platform without having to engage in cash transactions with ticket brokers.  Over time, as these transactions came to pass, Joe would finally have found a way to capitalize on his relationships in the music business and his ability to secure tickets to live events, while at the same time bringing transparency to what had long been a dark corner of the entertainment marketplace.  He would no longer struggle to convert the cash proceeds of his business into wire-able funds.  By the end of 2016, as the DTI transaction began to get off the ground, Joe believed he was on the verge of a dramatic success, the ultimate reward for his many years of hard work.

That all came crashing to a halt with his arrest on January 27, 2017.

### 4.    Other Mitigating Factors Weigh in Favor of a Lenient Sentence

The mitigating factors explained below make clear that the advisory Guidelines range in this case would result in a sentence far greater than necessary.

### a.      The Loss Amount Overstates Joe's Culpability

A proper understanding of the losses that occurred here provides further mitigation.  We do not dispute that, as we stipulated and as a matter of the proper application of the Guidelines, the applicable loss amount is between $25 million and $65 million.  PSR ¶ 33.  But, as a measure of culpability, this number overstates the loss caused by and the seriousness of Joe's offense.  In arriving at its forfeiture figure, we believe the Government simply netted out the gross receipts in the four accounts used for Joe's business (the "Accounts"), less funds returned to those same investors.[18]  That analysis is too simplistic for six important and independent reasons.

*First*, the analysis fails to account for those investors who were (a) paid out in cash, (b) paid by a transfer from a third party, and (c) paid back through various entities to which investors requested payment, but may not appear related to an outside reviewer.

*Second*, this figure includes approximately $6 million invested in 875 Holdings, LLC, which was somewhat different than the investment opportunities described above.[19]  Investors in

---

[18]     The Government has never explained the basis for the forfeiture and restitution amounts they are seeking.

[19]     Around the end of 2014, Joe's friend, Matthew Harriton, who was running a family office with and for his father, approached Joe with an idea to help him grow his business.  They proposed that rather than raise funds on a case-by-case basis as investment opportunities arose, Joe would be better off raising a general fund of capital, which could be pooled and held for subsequent investment in ticket transactions at Joe's discretion.  Joe agreed, and Harriton and his father subsequently formed an entity called 875 Holdings, LLC to accomplish this investment purpose.  *See Securities and Exchange Commission ("SEC") v. Meli*, 17-cv-632-LLS, First Amended Complaint (ECF No. 63) at ¶ 28 ("In soliciting the investments, Meli and Harriton represented that investor money would be pooled and used to buy a participation interest in profits from the resale of tickets for high profile events.  Investors were further told that 875 Holdings was a diversified fund whose purpose was to purchase tickets to various shows, and that the fund would have discretion as to which shows or events to purchase tickets for.").  Harriton created a similar structure for a second entity called Advance Entertainment II, LLC.

According to the SEC, between 2015 and 2017, 875 Holdings raised a total of $7.3 million from investors, and Advance Entertainment II raised a total of $17.5 million.  *Securities and Exchange Commission v. Meli*, 17-cv-632-LLS, Second Declaration of John B. McCann (ECF No. 121) at ¶¶ 27, 45.  Many of the investors in these two entities were people Harriton

875 Holdings were not investing in any particular ticket transaction, but were providing financing in exchange for an opportunity to invest in particular ticket transactions. Those investors received the benefit of their bargain and their investments should not be considered a loss based on any criminal conduct by Joe.[20]

    *Third*, the Guidelines loss figure includes losses that are actually business losses, not fraud losses. For example, as Joe fully disclosed to his investors at the time, the investment in the Desert Trip event was unsuccessful; the tickets did not sell for the premium that Joe had expected. As a result, his investors lost nearly millions in that transaction, but that is an ordinary business loss, not a fraud loss.

    *Fourth*, Joe disbursed millions out of the Accounts for remittance to his investors, only to see (in connection with sentencing) that certain of those investors had not been repaid by the partners to whom Joe remitted the funds.[21]

---

knew. Though he often met with these investors, at Harriton's request to explain his business, Joe did not know these investors as well as the investors in Advance Entertainment.

[20]    Furthermore, Matthew Harriton owns an 80% interest in and "controls" 875 Holdings. *See Securities and Exchange Commission v. Meli*, 17-632-LLS, First Amended Complaint (ECF No. 66) at ¶¶ 14-15.

[21]    For example, one group of investors, participating through an entity called ███ ███████ ███ invested a total of $4.5 million in Advance Entertainment from October 2015 through March 2016, seeking profit participation related to ticket sales for Adele and *Hamilton*. This investment pool was put together by ████ ██████ As with Harriton, Joe did not know these investors particularly well, but relied on ████ to handle the interaction with the investors. As is plainly shown in the Advance Entertainment bank records, beginning in March 2016 and ending in January 2017, Advance wired $5.3 million to the account designated by ███ ██████████ – including $5.1 million paid in two lump sums in August 2016 and January 2017 (an 18% return). When Advance wired the final $2 million payment to █████ ███████ on January 19, 2017, it was █████ responsibility to distribute the money to the ████████ investors in accordance with their investment agreement. Joe was not a party to that agreement. In connection with the Victim Impact Letters filed with this court, Joe was recently surprised to learn that certain of the individual investors who participated in the ██████ investment now claim that they have not received back their full principal and ████ ██████████ generally, claims that they received $1,513,849 of its $1,600,000 capital investment back ($86,151

*Fifth*, the analysis is over-inclusive in that there are millions in funds received in the Accounts that were not live-event ticket investment funds.  Certain funds counted in the analysis relate to personal loans or money contributed towards non-ticket related business ventures.

*Sixth*, the analysis fails to account for actual expenses, such as finder's fees paid to certain individuals and entities, which amounted to approximately $3 million, in aggregate, to Harriton, Tripoint Global Equities, LLC, ████ ██████ and David Molner.

The losses, moreover, were exacerbated by the sudden interruption of Joe's ticket business, which occurred with his unexpected arrest.  At the time of Joe's arrest, he had committed substantial amounts of cash to the purchase of tickets to three major live events — Tom Petty's stadium tour, Metallica's stadium tour, and the *Harry Potter* premiere on Broadway — that had not yet occurred.  The tickets had not yet been printed.  Additional millions had been invested in tickets for Adele and *Hamilton*, but the brokers who sold those tickets had not yet delivered the cash proceeds.  For all of these transactions, while the investors' funds had been committed, the only way for Joe to recoup that investment would be for him to have contact with the people with whom he had negotiated these ticket transactions.  But, after his arrest, that proved impossible.

Joe's ticketing business relied entirely on anonymity, discretion, and trust.  After the Government publicly condemned Joe as a fraud, nobody would speak to him, meet with him, or pay him the cash proceeds he was owed.  Some of the losses to Joe's investors were, therefore, the result of this business interruption.[22]

---

shortfall).  As will subsequently be developed with the Government within 90 days of sentencing, these claims are readily contradicted by available bank records.

[22]     In this sense, the offense carries some of the characteristics of a class of offenses described in the ABA sentencing report as "risk-shifting," *i.e.*, offenses that are "not specifically intended to cause loss," but which "shift the risk of any potential loss from the defendant . . . to a

###### b.   The Varacchi/Sentinel Conduct

Joe has pled not guilty to the charges relating to Mark Varacchi and Sentinel and, as part of its plea agreement, the Government has agreed to dismiss those charges. As such, we object to the inclusion of this information in the PSR as relevant conduct.[23]  Whether or not the Court considers the Varacchi/Sentinel conduct as relevant conduct, it should be viewed in its proper context as yet another example of Joe's generosity and implicit trust of his friends – and those he mistakenly viewed as friends.

Joe had nothing to do with Sentinel, until his longtime "friend" Varacchi sought Joe's help.[24]  He told Joe that he was in desperate need of capital and asked Joe for a short term loan, promising Joe an assured return of capital with substantial interest. In December 2015, Varacchi contacted Joe for an investment and between December 2015 and April 2016, Joe transferred a total of $3.75 million in the Sentinel fund. PSR ¶ 24. Joe believed he was helping a friend and

---

third party." Ex. P at 3 (AMERICAN BAR ASSOCIATION, A REPORT ON BEHALF OF THE AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE SECTION ON THE REFORM OF FEDERAL SENTENCING FOR ECONOMIC CRIMES (2014) (the "ABA Report"). Thus, here, by showing false documents to investors, Joe shifted the risk of loss from dishonest ticket brokers by himself to his investors. According to the ABA Report, this category of offenses is even less culpable than "legitimate *ab initio*" offenses. *Id.*

[23]    Varacchi is identified in the PSR as "CC-1." PSR ¶¶ 16 *et seq*. The Government has not met its burden tying this conduct to the criminal scheme to which Joe pled guilty.

[24]    Joe had known other members of the Varacchi family for years and, as a result, trusted Mark Varacchi and considered him a friend. As Joe recalls, Varacchi started talking to him about his hedge fund, Sentinel, sometime in 2013 or 2014. Varacchi told Joe that he had developed a proprietary method for investing in pre-IPO shares of private companies, which had proven to be quite successful. He repeatedly pressed Joe to invest, including by sending marketing materials and other purported information about his hedge fund and its various investment opportunities. *See, e.g.*, Ex. Q (E-mail from Mark Varacchi to Joe Meli (Apr. 13, 2015) ("First big IPO deal Friday is BATS . . . 10x oversubscribed . . .")); Ex. R (E-mail from Mark Varacchi to Joe Meli (Mar. 22, 2016) ("looking forward to getting in [additional] assets as april forward has potential to be big based [on] IPO schedule opening up")); Ex. S (E-mail from Mark Varacchi to Joe Meli (June 17, 2016) ("some big deals coming up")); Ex. T (E-mail from Mark Varacchi to Joe Meli (Sept. 22, 2016) (attaching IPO summary)).

making what he thought would be a good investment. It wasn't. Ultimately, Joe was a victim of Varacchi's conduct, losing approximately $3.5 million.

The Government contends that Joe's investments constituted knowing participation in the Sentinel fraud by tracing the source of the funds to particular investors in Advance Entertainment. *See* PSR ¶ 25. But Joe did not view it this way. Joe believed that his investors were investing in him and his ability to source and resell tickets. So long as Joe had other funds available (either in cash or otherwise) to fund his ticket purchases, he believed he could legally and properly use the capital he received in other ways. That Joe genuinely held this belief — even if the Government disputes that it was a proper reading of the funding agreements — belies the notion that simply putting the investor's funds into Sentinel means Joe was a willful and culpable participant in the Sentinel fraud.

Much of the evidence regarding Varacchi has been misinterpreted or overstated. Shortly after Varacchi implicated Joe in his own crimes, the Government arranged for Varacchi to record conversations with Joe. Eventually, Varacchi would record five conversations with Joe, between December 19, 2016 and January 26, 2017. During those conversations, Joe's focus was singular: he was trying to convince Varacchi to return his year-old $3.75 million investment, as Varacchi had promised to do. In an effort to convince Varacchi to return the money he owed him, Joe told Varacchi things that were not true about the source of the funds he invested in Sentinel, and about the urgency with which Joe needed the money returned. Specifically, Joe told Varacchi — falsely — that the $3.75 million he'd invested in Sentinel had come from a particular wealthy and powerful individual (the "Famous Investor"), who was well known in the hedge fund business, because he thought Varacchi would think this Famous Investor was someone not to be trifled with. But none of this was true. In truth, as the Government acknowledged in its

41

Complaint, the funds used to support Joe's Sentinel investment had not come from the Famous Investor.[25]  Joe had received an investment from the Famous Investor, but had fully repaid that investor everything that was owed to him (including a substantial return on his investment) as of February 2016 (nine months prior to the recorded call).  Read from that perspective — which was the perspective Joe had throughout these conversations — the recordings are not incriminating at all, and certainly do not show Joe to be conspiring with Varacchi.

By way of example, the Complaint makes much of a December 19, 2016, conversation between Joe and Varacchi.  During this conversation, Varacchi asked Joe if the Famous Investor had been the one who reported Varacchi to the SEC.  Joe's response and the Government's mistaken interpretation of that response are set forth in the following table:

| Text | Government's Interpretation | What Actually Happened |
|---|---|---|
| Meli:  "It would be impossible for anyone on planet earth unless you told them, okay, to know what we did." | With this statement, Meli was re-assuring Varacchi "that it would be impossible for anyone to determine that Meli had misappropriated funds from his own investor for use by Varacchi to repay the funds that Varacchi owed to Victim Entity-1." *See* Complaint ¶ 29(c)(ii). | Meli never acknowledged misappropriating anything.  Meli knew that he hadn't used funds from the Famous Investor to invest in Sentinel; that was part of the phony tale he told Varacchi.  Thus, the only way the SEC could have learned about the Famous Investor, who, as discussed *supra*, was not actually the source of funds Meli sent to Sentinel, would have been from Varacchi. |

During the same conversation, in the context of telling Joe that he would soon return his money, Varacchi, under Government surveillance, made an elliptical suggestion about being prepared for a hypothetical SEC audit:  "We should probably have something that says

---

[25]     *See* ECF No. 1 (Complaint) at 14, n.3 ("Based on my review of bank records, and contrary to Meli's statement to CW-1, funds from Victim Entity-3, but not Victim Entity-4 [the Famous Investor], were transferred by Meli to the CW-1 [Varacchi] in order to make repayments to Victim Entity-1 [Sentinel investor unknown to Joe].").

something related to that audit so that we have it into perpetuity locked away in a drawer."

Anxious to get his money back, Joe replied "Yeah, yeah, yeah, no problem."  Once again, the

Government inaccurately spun this as something more nefarious, suggesting this exchange meant

that "[Varacchi] further suggested to MELI that they create a written document falsely stating

that the purpose of transferring the funds to [Sentinel] was 'related to tickets.' MELI agreed to

the ***creation of false documents***."  Complaint ¶ 29(c)(iv) (emphasis added).  In reality, Joe was

simply brushing off whatever suggestion Varacchi was making – one he did not even understand

– because he was focused on getting Varacchi to return the money he'd invested.

c.        <u>**Mitigating Circumstances Relating to Craig Carton**</u>

While Joe has pled guilty to an overall course of conduct that includes the specified

conduct with Craig Carton (PSR ¶¶ 27-29), the circumstances surrounding his actions, when

viewed in the proper context, are much less egregious than they appear in the PSR.  While Joe

was aware of Carton's actions, as explained below, he sought to guide Carton away from a

course of conduct in which Carton used an investor's money simply to repay Carton's own

gambling debts.  Meli's limited involvement was motivated by his desire to help a friend with a

significant gambling problem deal with his gambling debts.

On September 6, 2017, about eight months after Joe's arrest, the FBI arrested Craig

Carton and Michael Wright on related charges.  Though Joe was not charged along with Carton

and Wright, he is referenced in that complaint as a co-conspirator and some of the conduct set

forth in that complaint is included as "Offense Conduct" in the PSR.

In 2015, Joe began working closely with Carton on promoting live events.  As Joe would

come to learn, however, over the course of 2015 and 2016, Carton also was an addicted gambler

who was in need of money.  For example, on September 7, 2016, Carton emailed Meli:



I[']m a big boy i know better but I felt I [ha]d no other way to deliver and ***took the burden on my shoulders without telling you guys*** how or what i was doing and I apologize for that . . . it[']s shameful how i[']ve [put] financial strain on my family and you in this manner: i ain[']t proud of it and ***i won[']t hide from it***.

Ex. U (Email from Craig Carton to Joe Meli (Sept. 7, 2016)) (emphasis added).[26]  In the end, Joe

loaned Carton and other entities owned or controlled by Carton approximately $8 million, most

of which was used to help cover Carton's gambling debts, because Carton led Joe to believe that

he would one day help Joe obtain valuable tickets to live events.  Carton never did.

As they spent more and more time together, Carton came to see how Joe structured ticket

transactions, and he essentially copied it.  However, unlike Joe — who had spent decades

working in the live event space and understood the business well — Carton had no relevant

experience, and no ability to procure tickets in bulk.  However, in December 2016, Carton sent a

series of fraudulent letter agreements to a particular hedge fund, using Joe's name, and falsely

representing that Joe had arranged for the purchase of tickets to various live events.[27]  By

---

[26]     Similarly, on August 31, 2016, Carton emailed Meli and said, "I have some selfish bad news and frankly need help. . . .  Totally my responsibility but I am out of good luck charms and money ████████████████████████████████████████████████████████████████████████" Ex. V (Email from Craig Carton to Joe Meli (Aug. 31, 2016)).

[27]     The PSR states that Joe provided Carton with these letter agreements.  PSR ¶ 28.  In fact, while Joe was aware that Carton requested that these false letter agreements be created, David Molner actually drafted these letter agreements and sent them directly to Carton, based on Carton's desired specifications.  *See* Ex. W (E-mail from Craig Carton to David Molner (Dec. 16, 2016)).  Prior to Carton's communications with the Hedge Fund, Joe was involved in good faith negotiations with ████████ and ████████████████████ to procure tour tickets for certain (but not all) of the artists Carton indicated to the Hedge Fund that Advance had already secured.  In fact, ████████████████████ helped Joe draft an email to ████ ████ in order to effectuate the negotiations.  *See* Exs. X, Y, and Z (E-mails by and between Joe Meli, ████ ████ and ██ ████████ (Dec. 11-13, 2016)).

December 2016, Carton had arranged a line of credit with that hedge fund to support the purchase of tickets for resale.

But rather than use those funds to purchase tickets, Carton proposed to Joe that they use that money to pay Carton's gambling debts. Joe's reaction — as recounted, but mischaracterized in the Carton criminal complaint — is telling. Joe told him not to do it.

Responding to Carton's suggestion, Joe wrote:

> [If we use the hedge fund money to repay debts], [w]here do we get the money to buy tickets and furthermore what deal do we offer the money provider for the tickets? We can not pay [the Hedge Fund] with other people's money right away because it does not work. We need [the Hedge Fund] to buy deals with long lead times and earn money in the interim and use the earned money to replace the [Hedge Fund] funds in ticket deals [in] the future. That is the math we have to figure out and work it into a schedule to get down to zero.

*United States v. Carton*, 17-cr-680 (S.D.N.Y. 2017), Complaint ¶ 12(d). Joe was explicitly telling Carton not to use the Hedge Fund's money to repay debts, but to use the Hedge Fund's money to "buy deals with long lead times," which would give them an opportunity to "earn money" and then use the "earned money" to fund future ticket deals.[28] Consistent with his conduct, as explained above, Joe sought to use investor funds for their intended ticket purposes.

### D.   The Nature and Characteristics of the Defendant

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). Joe's life has been a life full of deposits of good deeds and acts

---

[28]   The PSR states, presumably referring to the same text message, that "MELI discussed with his co-conspirators their plan to misappropriate the hedge fund's investment, using it instead to repay debts." PSR ¶ 27. But, as the quoted text message makes clear, Joe was explicitly saying not to do that. The Government's characterization is baffling.

of loving kindness. We respectfully submit that Joe's sentencing is an appropriate time for him to receive credit for his lifetime of good deeds.[29]

As the letters attached compellingly demonstrate, Joe is a good and decent man whose most defining traits are his kindness and generosity to friends, family, and strangers, alike.  In numerous instances recounted, Joe has gone above-and-beyond to make others feel better.  "[I]t is men like Joseph Meli that make this world a better place."  Ad. Ex. 30 (████ ██ Letter).  According to his father, Joe's "clearly defining characteristic is his empathy and compassion for others.  Joe is, absolutely and without question, a giver, not a taker, and he has been all of his life."  Ad. Ex. 4 (████ ██ Letter).  "To say Joseph has a 'big heart' is an understatement.  I believe it would feel unnatural for Joe to turn a blind eye on anyone in need, be it family or otherwise.  His generous spirit comes without expectation, discussion or judgement and I believe his greatest joy is to know he has put a smile on someone's face and lightened their load in some way."  Ad. Ex. 30 (████ ██ Letter).  He is the type of person who is always looking for ways to make other people happy.[30]

---

[29]    A defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines.  *See United States v. Rita*, 551 U.S. 338, 364-65 (Stevens, J., concurring) ("Matters such as . . . charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider."  *See also United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Ali*, 508 F.3d 136, 150 & n.19 (3d Cir 2007) (upholding downward departure where the defendant, *inter alia*, "helped organize fundraising banquets for the [school where she worked], contributed her 'personal assistance from leading to scrubbing floors,' spent several hours 'counseling and comforting' a student's parent who was struggling to overcome drug-addiction, and became the 'legal guardian' to two nieces to ensure that they attended better schools." (record citation omitted)).

[30]    Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. *See, e.g.*, *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2010) (describing how the defendant's "charitable acts that involved not only money, but also his

Prior to his shocking arrest in this case, Joe had never been in any serious trouble.[31]  The

crime he committed was a bad mistake, but it doesn't come close to defining who Joe Meli is.  In

fact, the offense conduct in this case largely occurred between 2014 and 2016 — a time when

Joe ████████████████████████████, had a new baby in his household, and ███████████

████████████████████████████████████.[32]  ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████  ████████████████████████  █████████████

██████████████████████████████████████████████████████████

██████████████████████████████

personal time."); *United States v. Cooper*, 394 F.3d 172, 177, 178 (3d Cir. 2005) (noting that
personal sacrifices "are qualitatively different from the detached donation of money" particularly
where the defendant's good works included "hands-on personal sacrifices, which have had a
dramatic and positive impact on the lives of others"); *United States v. Serafini*, 233 F.3d 758,
773, 775 (3d Cir. 2000) (noting that Serafini's contributions "weren't acts of just giving money,
they were acts of giving time, of giving one's self").

[31]     The PSR refers to a 1998 conviction for DWI, but this is a mistake.  PSR ¶ 52.  In truth,
Joe pled guilty to driving without a license, which is why he received a conditional discharge.

[32]



███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████

In passing judgment, Joe should be judged by his defining characteristics:  the kindness, generosity, and positive energy he projects into the world on a daily basis – and not by his mistakes ████████████████████████████████████████  As the many letters attached to this submission demonstrate, Joe is simply not the kind of person that would ever knowingly hurt another person.  We submit that Joe's offense represents a small slice of the rich life Joe has lived over his 43 years.

Finally, there can be no denying that Joe is a devoted husband, father, brother, nephew, cousin, and son.  His family, specifically his four young boys, desperately need Joe in their lives.  "Childhoods are short and that is what is on the line here."  Ad. Ex. 27 (████  ████  Joe's sentence will have a "deep impact" on the development, and future of his children.  *Id*.  "With not just one, but six lives hanging in the balance . . . the highest good in this situation would be served through very compassionate sentencing" that follows a "therapeutic course" and permits Joe "access to his family so that he can be present . . . and they can move towards healing and integration."  Ad. Ex 2 (████  ████ Letter).  The collateral consequences of a prolonged

period of incarceration on Joe's wife and children will be devastating.  *See* Ad. Ex. 19 (██████ ██████ Letter).  As one letter stated, "I know the pain this entire situation has brought to the many people he affected but his family, specifically his young boys are collateral damage . . . His son[]s played no role in this situation at all and yet they will pay the steepest price.  They are young bystanders who may very well lose their father for their formative years."  Ad. Ex. 11 (██████ ██████ Letter).  This "is not a sentence for one man but rather for 4 boys.  Four great joyous beings that will be young men themselves soon who rely on their father's love, support and devotion as they have had enjoyed continuously since their first day."  Ad. Ex. 25 (██████ ██████ Letter).

Joe Meli's "history and characteristics" also weigh strongly in favor of leniency.  18 U.S.C. § 3553(a)(1).

E.    **The Need for the Sentence**

Section 3553(a)(2) requires the Court to consider the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," as well as the need to "afford adequate deterrence to criminal conduct," and to "protect the public from further crimes of the defendant."  Those needs are also fully consistent with leniency in this case.

While Joe's crime is worthy of condemnation, it is hardly a prototypical securities fraud case.  The fundamental purpose of the securities laws is to protect the integrity of the public markets and promote investor confidence.  *See, e.g.*, *Securities and Exchange Commission v. Zandford*, 535 U.S. 813, 819 (2002) ("Among Congress' objectives in passing the [Securities] Act was to ensure honest securities markets . . . after the market crash of 1929."); *United States v. Chiarella*, 588 F.2d 1358, 1365 (2d Cir. 1978) ("A major purpose of the antifraud provisions

49

[of the securities laws] was to protect the integrity of the marketplace in which securities are traded.").

This case, of course, has nothing to do with the public markets and will have no bearing on investor confidence. Joe marketed the opportunity to invest in his business privately, almost always to people he knew well. His investors were savvy and sophisticated market participants who fully understood the nature of the investment opportunity. The Court does not need to impose a severe sentence on Joe to promote respect for the securities law or inspire investor confidence. We do not dispute that Joe's conduct constituted securities fraud, but in fashioning an appropriate sentence, we urge the Court to bear in mind that this case has nothing to do with the underlying reasons that federal courts typically punish securities violators. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) ("The 1934 Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges.").

Given the punishment that Joe has already received — watching the destruction of his business, the tarnishing of his reputation, and the loss of substantial business opportunities he'd worked his whole life to create[33] — and the punishment he will continue to receive as a convicted felon, there is no basis to believe that he would commit any other crimes in the future. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a felon). Moreover, given the public nature of this prosecution, it is extremely unlikely that Joe would or could ever commit another

---

[33]    As a result of his arrest, DTI canceled Joe's equity stake in the company, which was valued at approximately $20 million.

securities fraud crime.  As such, there is no need for substantial additional incarceration to further the goal of specific deterrence.

There is also no need for a lengthy prison sentence to protect the public.  The pain Joe has suffered over the past fourteen months has convinced him, beyond any doubt, to be more careful with the representations he makes to investors and to avoid, entirely, the kind of behavior that brings him before the Court for sentencing.  Prior to this case, Joe had never been in any serious trouble with the law.  There is no reason to think he will engage in any similar conduct in the future.

Finally, a lengthy prison sentence is not needed in this case to deter others.  As a general matter, several courts have recognized that lengthy prison sentences are not needed to deter other would-be white collar offenders.  *See, e.g.*, *Adelson*, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on 'white collar' offenders"); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (concluding that "a relatively modest prison term should be 'sufficient, but not more than necessary,'" since "common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not."); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").  But more specifically, in this case, the community of potential offenders to deter is small.  The business Joe was involved with, and from which this offense arose — namely, the forward financing of live events through the purchase and sale of premium tickets — is a business that Joe invented.  The relevant community is Joe, and he has been adequately deterred.

### F.  Sentencing Guidelines Range

While this Court is required to consider the Federal Guidelines Range in fashioning its sentence, the resulting recommended range of 78 to 97 months is harsh and far more than necessary to meet the sentencing goals of § 3553(a).  It is significant that Probation also found:

> In light of the factors in 18 USC §3553(a), including the need to address the sentencing objectives of punishment that are not greater than necessary and personal deterrence, ***we believe a non-guidelines custodial sentence is warranted in this case***.  Meli has one prior conviction from 1998 and was the primary financial provider for not only his immediate family, but financially supported his sister and his children.  The defendant has a substantial substance abuse history as well as mental health concerns, which may have ultimately impacted his judgment and decision making during the course of the offense. . . .
>
> Specifically, we respectfully recommend that the Court impose a sentence of 54 months' imprisonment, followed by three years' supervised release . . .

PSR at 32 (emphasis added).

Here, the recommended Federal Sentencing Guidelines range is driven, more than any other factor, by the loss enhancements delineated in § 2B1.1.  However, the stipulated loss amount — between $25 and $65 million here and accompanying 22-level Guideline enhancement — eclipses the reality of Joe's offense.[34]

---

[34]  The loss amount enhancement is out of line with enhancements elsewhere in § 2B1.1 and in the Guidelines as a whole, and it effectively renders the Guidelines meaningless in white collar cases.  *See Adelson*, 441 F. Supp. 2d at 512 (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.").

A review of the Guidelines demonstrates that no other enhancement in § 2B (or § 2A that deals with violent crimes) even approaches the enhancements required for loss amount.  The largest enhancements *anywhere* in the 2016 Guidelines appear to be:

- Bid-rigging or price-fixing, if the volume of commerce exceeds $1.5 billion (U.S.S.G. § 2R1.1(b)(2)(H):  16 points;
- Willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life (U.S.S.G. § 2K1.5(b)(1)):  15 points;

Loss enhancements are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). The enhancements consider neither the criminal's culpability nor the victims' impact. It is not surprising that courts have bemoaned the enhancements as "more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology — thus maximizing the risk of injustice." *Gupta*, 904 F. Supp. 2d at 351 (imposing a 24-month sentence, despite a 78- to 97-month range).

In *Rivernider*, for example, the Second Circuit affirmed a sentence below the Guidelines range because the Guidelines' calculations based on loss amount — over $20 million — "significantly overstate[d] the defendant's culpability." Transcript of Record at 212:5-14, *United States v. Rivernider*, 10-cr-00222 (RNC) (D. Conn. Dec. 18, 2013) (No. 609). The district court had observed that the defendant, like Joe, "was not a predatory fraudster" and "had engaged in significant investment activity." *United States v. Rivernider,* 828 F.3d 91, 111 (2d Cir. 2016). And, "although [the defendant] misled clients about the risk, he did not steal from them outright." *Id*. Similarly, in *Caspersen*, the stipulated loss amount was $36 million — with the same loss enhancement offense level as here. *United States v. Caspersen*, 16-cr-00414 (JSR) (S.D.N.Y Nov. 4, 2016). Although the Guideline range called for a sentence between 151-188 months, and Probation recommended 84 months, the court imposed a sentence of 48 months.

---

- Trafficking, receiving or possessing a portable rocket, missile or launcher (U.S.S.G. § 2K2.1(b)(3)(A): 15 points;
- Obstruction of justice related to terrorism (U.S.S.G. § 2J1.2(b)(1)(C)): 12 points;
- Felony involving or intending to promote terrorism (U.S.S.G. § 3A1.4(a)): 12 points.

Thus, other than the enhancement for loss amount under § 2B1.1(b)(1), the largest enhancements in all of the Guidelines are 12-16 points. The 22-level enhancement sought here is enormously disproportionate when considering the Guidelines as a whole. It defies all logic that the most serious aggravating factor in the entire constellation of federal criminal law is the *amount of loss in white-collar fraud cases*.

The court expressed skepticism at the loss enhancement, commenting that "the great bulk of the calculation comes from the loss amount," "overwhelming every other factor." *Id*.

### 1.    The ABA Guidelines are Instructive and Suggest that a Sentencing Range of Not More Than 21 to 27 Months is Appropriate

A report published by the Criminal Justice Section of the American Bar Association provides a useful framework in determining what an appropriate non-guidelines sentence should be. *See* Ex. P (the "ABA Report"). The report, which was prepared by a panel of experienced judges, scholars, and practitioners, proposed a fundamentally new approach to sentencing for economic crimes.[35] Among other things, it suggested that sentencing courts focus less on quantifiable factors (like loss amount) in favor of a more qualitative assessment of culpability.[36]

In assessing culpability, the drafters of the ABA Report suggest that sentencing courts consider "an array of factors," including the defendant's motive and the "correlation between the amount of loss and the amount of the defendant's gain." Ex. P (ABA Report at 1.) In considering motive, the report distinguishes offenses, like this one, that are "legitimate *ab initio*," *i.e.*, offenses that arise from "otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties," from more predatory offenses. *Id*. at 2-3.

---

[35]      In our view, application of the approach suggested by the ABA Report would result, at most, in an advisory Guideline range of 21 to 27 months. The offense level would begin with a base offense level of 7, combined with a loss enhancement level of 12, minus 4 levels to reflect Joe's appropriate level of culpability, and plus 2 for the appropriate victim impact level. With the adjustments for multiple victims (+2) and acceptance of responsibility (-3) set forth in the plea agreement, the resulting total offense level would be 16. Even assuming a higher level of culpability and victim impact, any sentence for Joe's conduct promulgated under the ABA Guidelines would be below Probation's recommended sentence.

[36]      In the past three years, at least three cases in this Circuit have expressly relied upon this Report in fashioning an appropriate sentence. *See United States v. Rivernider*, 828 F.3d 91 (2d Cir. 2016); *United States v. Faibish*, 12-cr-265 (ENV) (E.D.N.Y. Aug. 3, 2015); *United States v. Litvak*, 13-cr-0019 (JCH) (D. Conn. July 23, 2014). In *Faibish*, Judge Vitiliano of the Eastern District commented on his view that the Report's analysis was "fairly reflective of what a court is required to under Section 3553(a)." Transcript of Record at 54:2-3, *Faibish* (No. 267).

Here, Joe had a real ticket resale business and tried to live up to his commitments.  The offense of conviction — inducing investments through false documents — arose entirely because of, among other factors, the unexpected difficulty of reconciling investors' need for documentation with the informal and irregular secondary market for ticket transactions, and the related need to preserve the anonymity of ticket suppliers.  While not an excuse for Joe's use of the falsified letter agreements, these considerations greatly mitigate the seriousness of the offense.

For similar reasons, because Joe's business was not fictitious, but rather one that involved fraudulent inducements collateral to the essential bargain, we submit that a fair consideration of the "nature and circumstances of the offense" warrants a much more lenient sentence here.

### 2.     Alternatively, the Court Should Look to the 1987 Guidelines in Determining which Non-Guidelines Sentence is Appropriate

Several courts have concluded that to the extent the Sentencing Guidelines are entitled to any significant weight, it is because they represent the accumulated wisdom of sentencing courts around the country.  *See Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (the weight afforded the Guidelines is owed in part to the empirical approach typically employed by the Sentencing Commission, which "fills an important institutional role:  It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.").  As many courts and commenters have observed, however, in the case of securities fraud, the Sentencing Commission has repeatedly increased the applicable sentencing ranges, but without any evidence that this was guided by national experience or the accumulated wisdom of sentencing courts.  Thus, in a securities fraud case such as this one, the applicable Guidelines range should be given very little weight by the Court in considering a sentence sufficient, but not greater than necessary to accomplish the goals of

55

Section 3553(a).  *See United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (citing

*Kimbrough*, 552 U.S. at 574-75.

In response to the fraud Guidelines' progressively increasing severity, many judges have

referred to the original 1987 fraud Guidelines in making sentencing determinations.  *See*

Transcript of Record at 18:24-19:5; 45:18-20, *United States v. Watts*, 10-cr-00627 (KAM)

(E.D.N.Y. Apr. 24, 2014) (No. 782) (sentencing defendant within 1987 Guidelines range based

on counsel's recommendation); Transcript of Record at 20:4-9; 21:6-9, *United States v. Hochfeld*,

13-cr-00021 (PAC) (S.D.N.Y. Aug. 5, 2013) (No. 29) (using 1987 Guidelines to calculate 30 to

37 month Guideline range in lieu of applying the "harsh result" using the current Guidelines).

Under the 1987 fraud Guidelines, adopting the stipulated loss amount here, Joe's offense level

would be 17, with a sentencing range of between 24-30 months.  *See* U.S.S.G. §§ 2F1.1; 5A

(1987).  That is commensurate with our proposed range of a sentence at or below 21-27 months.

### G.   The Need to Avoid Unwarranted Disparity

Finally, § 3553(a)(6) calls for the Court, in fashioning its sentence, to consider "the need

to avoid unwarranted disparities among defendants with similar records who have been found

guilty of similar conduct."  Indeed, this concern about unwarranted disparities was one of

Congress's principal goals when it established the United States Sentencing Commission through

the passage of the Sentencing Reform Act of 1984.  *See* Kate Stith and Jose A. Cabranes, FEAR

OF JUDGING:  SENTENCING GUIDELINES IN THE FEDERAL COURTS 104 (1999) ("Reduction of

'unwarranted sentencing disparities' was a – probably *the* – goal of the Sentencing Reform Act

of 1984."); U.S.S.C.*, Fifteen Years of Guidelines Sentencing* (2004) ("The legislative history of

the SRA . . . devotes more space documenting the 'shameful disparity' constituting a 'major flaw

in the existing criminal justice system than on any other aspect of preguidelines sentencing

practices.").  While the pendulum has (rightfully) swung back to giving sentencing judges

greater discretion, the avoidance of unwarranted disparity – as required by § 3553(a) – is still a primary goal of the federal sentencing regime.

As with the other factors set forth in § 3553(a), the need to avoid unwarranted disparities in sentencing weighs in favor of leniency in this case. To assist the Court with its consideration of this factor, counsel for Joe retained the National Center on Institutions and Alternatives (NCIA) to analyze all sentences imposed on defendants who pled guilty to 18 U.S.C. § 78j(b) and § 78ff since 2005, when the Supreme Court's *Booker* decision rendered the Guidelines advisory. *See* Ex. DD (Federal Sentencing Statistical Analysis Report (Mar. 2018)). Among NCIA's findings is that between January 2005 and September 2016, 189 defendants pled guilty to securities fraud and were sentenced without the benefit of a § 5K1.1 motion. For those 189 defendants, whose offense levels ranged from level 15 to level 30, the average term of imprisonment was just over three years, or 39.8 months. Twelve of those 189 defendants were sentenced with an offense level of 28 (the stipulated offense level in this case) – one of those twelve received a sentence of probation and another received a split sentence.

This nationwide trend is generally consistent with the practice in the Southern District of New York. The average term of imprisonment in this District for all securities fraud defendants sentenced without the benefit of a § 5K1.1 motion was 35 months. Of the six defendants sentenced in the Southern District of New York for securities fraud that had a total offense level of 28, only one received the advisory guideline minimum sentence of 78 months imprisonment. The remaining five defendants were sentenced below the applicable guideline range. One defendant received 24 months' probation; another received a split sentence of 42 months imprisonment, 18 months home confinement, and 150 hours of community service; the last three received sentences ranging from 24 months to 38 months.

A sentence significantly below the bottom of the applicable guidelines range would not be without precedent in this District.  In *United States* v. *Newkirk*, 16-cr-1341 (JSR) (S.D.N.Y. Apr. 21, 2016), a securities fraud defendant convicted at trial was sentenced to a term of imprisonment of 6 months notwithstanding a Guidelines range of 135 to 168 months.  Another securities fraud defendant recently convicted at trial, Stefan Lumiere, was sentenced to a term of imprisonment of 18 months with a Guidelines range of 87 to 108 months.  *United States v. Lumiere*, 16-cr-00483 (JSR) (S.D.N.Y.  May 31, 2017).  Three defendants sentenced recently in this District with a Guidelines range (like the one applicable here) of 78 to 97 months, were sentenced, respectively, to terms of imprisonment of 24 months (*Hochfeld*, 13-cr-00021 (PAC) (S.D.N.Y. 2013)), 24 months (*United States v. Gray*, 15-cr-00297 (SHS) (S.D.N.Y. Oct. 25, 2016)), and 30 months (*United States v. Hampton,* 13-cr-301 (RWS) (S.D.N.Y. 2013)).

We respectfully submit that this case is not average.  For all the reasons set forth herein, we submit that Joe Meli should receive a sentence more lenient than that imposed on the average securities fraud defendant.

### H.    The Need to Provide Restitution

Joe Meli is committed to making full restitution in this case.  "He has told us repeatedly that his greatest wish is to compensate his investors and make them whole.  Joe's sole focus is to restore his reputation, pay restitution . . . and finish this chapter in a way that makes his children understand the difference between right and wrong."  Ad. Ex. 36 (███ and ████████ Letter). "I have spent a considerable amount of time with Joe since his criminal charges surfaced.  He knows he made a mistake and, based on my knowledge of Joe and his tenacity, I believe Joe will work extremely hard making up for that mistake."  Ad. Ex. 37 (████████ Letter).  A long prison sentence will interfere with his ability to make restitution.  This factor weighs in favor of leniency as well.

58

As explained above, since his arrest, Joe has sought to gather available funds to make full restitution to his investors.  Through counsel, Joe has provided information and documents to U.S. Probation in an effort to assist the Government in collecting available funds.  Joe is resolved to work with the Government to recover and liquidate his assets as quickly and orderly as possible so that restitution may be fully made.[37]

Incarcerating Joe for an extended period will make it more difficult for him to repay his victims.  Section 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims."  A modest sentence in this case will permit Joe to best recover assets for restitution and make good on his obligations to his investors.  *See United States v. Rangel*, 697 F.3d 795, 803-4 (9th Cir. 2012) (observing that "the district court's goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant.").  A long sentence may reduce the likelihood that Joe's investors get repaid in full.

I.      **To Achieve the Goals of Sentencing, the Court Should Consider Substituting a Portion of Joe's Sentence with <u>Home Confinement and a Substantial Community Service Condition</u>**

The above analysis suggests Joe's sentence should be no more than a term of imprisonment of 21 to 27 months.  Pursuant to §3553(a), however, the Court is also free to consider "the kinds of sentences available," including substituting some of the period of incarceration with home confinement and community service.[38]

---

[37]     Recently, Joe has tapped into his vast business network to help connect institutional investors with potential real estate opportunities.  Though he has not yet earned any fees or commissions in connection with that work, any such income he earns will be reported to the Government and the Court and used to satisfy the restitution here.  Joe will continue to endeavor to make full restitution to his investors as quickly as possible.

[38]     Under the current calculation of the Guidelines, Joe is not eligible for a probationary sentence, because his Guidelines level falls in Zone D of the Sentencing Table.  *See* U.S.S.G. § 5C1.1(f).  However, because this Court is not bound by the Guidelines, it is permitted to order a non-Guidelines sentence.  *See United States v. Duhon*, 541 F.3d 391, 398 (5th Cir. 2008) (affirming probationary sentence for offender in Zone D); *United States v. Autery*, 555 F.3d 864 (9th Cir.

The wide endorsement of community service by both federal and state courts can be attributed to individual judges who recognize that it "is a burdensome penalty that meets with widespread public approval, is inexpensive to administer . . . produces public value . . . and . . . can to a significant extent be scaled to the seriousness of crimes."  Michael Tonry & Mary Lynch, *Intermediate Sanctions*, 20 CRIME & JUST. 99, 124 (1996).  Similarly, a 2005 publication of the Administrative Office of the U.S. Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community.  It is practical, cost-effective, and fair — a 'win-win' proposition for everyone involved."[39]  In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends that courts "can use community service successfully . . . for offenders with personal and social stability, who are willing, motivated, and who have no history of violence."  Needless to say, Joe fits that description perfectly.

Such a remedy is not merely abstract.  Despite an advisory sentencing range of 46-57 months imprisonment, in a recent case, the court imposed a sentence of a two-year term of probation with 500 hours of community service.  Following a determination that the defendant's lifetime of good works, charitable donations, and positive contributions was exemplary, the court found that imprisonment simply was not a just and proper sentence in that case.  *United States v. Warner*, 13-cr-00731 (CPK) (N.D. Ill. Jan. 14, 2014).  The court recognized that incarceration would do more harm to society than good:

---

2009) (same); *see also United States v. Chettiar*, 501 F.3d 854, 859 (8th Cir. 2007) (observing that imposition of a sentence involving home detention upon defendant in Zone D effectively constituted "having moved the Zone B overlay upward" pursuant to a variance).

[39]     Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, *Court & Community Informational Series: Community Service* (2005), available at http://www.uscourts.gov/misc/revision-community.pdf.

> [I]n the end as you can tell from my remarks, what I found most significant is that, yes, he committed crimes; he hid; he acted in a way that a lot of other people acted, who try to cheat the government . . . I do not know the motivations . . . But it is not that, that triggers whatever a proper sentence will be in this case because in [this] case, as I have alluded to quite frequently in this presentation of my own, he did things that I am not aware anyone else does.  Certainly, not anyone before me.  And it would be unjust for me to ignore that, not measure it and not say, in the end, that trumps all of the ill-will and misconduct he engaged in.  And really — and I believe this with all of my heart — society will be best served by allowing him to continue his good works.

*Id.*, Tr. of Record at 52:3-53:1 (No. 33); *see also United States v. Brady*, 2004 WL 86414, at *8-9

(E.D.N.Y. Jan. 20, 2004).

Community service can serve as a significant sanction.  In a financial fraud case, Judge Gleeson sentenced a defendant whose conduct led to a $110 million loss to community service:

> [N]othing should ever be out of bounds . . . and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances.  I don't think the goals of sentencing here require you to be incarcerated.

*United States v. Shamilzadeh*, 04-cr-194 (JG) (E.D.N.Y. Apr. 1, 2008).

Here, substituting a period of Joe's incarceration with home confinement and community service would permit Joe to remain a part of the family life and community of which he is an integral part, but would nonetheless constitute a substantial loss of liberty for Joe, and make clear to him and others that breaking the law has serious consequences.  Joe's good works, positive contributions to his community and numerous acts of generosity outweigh his misconduct. Furthermore, Joe is a first-time offender; he has no history of violence, and he is highly motivated to continue serving his community.  These factors make him a perfect candidate for

61

such a substitution.  A rigorous and appropriately structured community service program for Joe could serve the needs of justice very effectively in this case, by taking Joe's time and expertise in the entertainment industry and putting them to use in a constructive and useful manner.

In fact, an organization already has made clear that they could benefit from Joe's professional skills and talents.  Attached to this memorandum is a letter from Christine Pahigan, Executive Director of Friends of Island Academy.  Ad. Ex. 38.[40]  Several weeks ago, Ms. Pahigan met with Joe at the Friends program offices in Harlem to interview Joe for consideration as a potential resource for the Academy.  She "was struck by his genuine empathy and his interest in our services and work with youth."  *Id*.  Ms. Pahigan determined that her organization "would be grateful to have [Joe] placed with us."  *Id*.  She noted "the potential for [Joe] to put his knowledge of the music industry to benefit both individual youth members and our organization as a whole," *id.*, and Joe has already drafted a detailed proposal for a student-led charity concert, with corporate and community sponsorships, which he is excited about developing in connection with Ms. Pahigan and the Friends of Island community.

Incarcerating Joe for the entirety of his sentence will not benefit society; in fact, it would be costly, wasteful, and unnecessary.  Substituting part of his sentence with home confinement and community service, however, will allow him to work for the community while still serving the goals and purposes of sentencing.  His placement would contribute to significant and lasting changes in the lives of the young adults Friends serves.  There is little doubt that Joe can be of significant benefit to any organization that could utilize his extraordinary skills.

---

[40]     Friends of Island Academy ("Friends") is a nonprofit organization which provides reentry services for young people, 16-21 years of age, following their release from juvenile or criminal justice custody at Rikers Island.

## **CONCLUSION**

For all the reasons set forth above, we respectfully submit that a lenient sentence is warranted.  When the Court takes into account Joe's lifetime of charitable deeds and kindness, the aberrant nature of the offense, and considers the ABA Report as well as the 1987 Guidelines, and the apparent practices in this District, we respectfully submit that these alternative measures of finding an appropriate sentence in a case like this all yield a similar result:  that a sentence of not more than 21 to 27 months would be appropriate in this case.  Accordingly, we respectfully ask this Court to impose a sentence of imprisonment of no greater than 21 to 27 months, with a recommendation that Joe ████████████████████████████████, and with a portion of that time possibly substituted by home confinement and community service.


Dated: March 14, 2018

Respectfully submitted,

By: _/s/ Daniel J. Fetterman_____        By: _/s/  Daniel L. Stein_____
Daniel J. Fetterman                         Daniel L. Stein
Michael P. Bowen                            Mayer Brown LLP
Jeffrey R. Alexander                        1221 Avenue of the Americas
Joshua S. Brown                             New York, New York 10020
Kasowitz Benson Torres LLP                  (212) 506-2500
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Joseph Meli*