UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

UNITED STATES OF AMERICA
                                          :

          - v. -
                                          :          S1 17 Cr. 127 (KMW)

JOSEPH MELI,
                                          :

                    Defendant.
                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                                          GEOFFREY S. BERMAN
                                          United States Attorney for
                                          the Southern District of New York

Elisha J. Kobre
Brendan F. Quigley
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

**BACKGROUND** ............................................................................................................ **2**

  I.  Overview of the Scheme ........................................................................... 2

    A.  Meli Uses Investor Funds to Buy a House in the Hamptons ......................... 4

    B.  Meli Uses Investor Funds In Connection with a Separate Ponzi Scheme .................. 5

    C.  Meli Uses Investor Funds to Buy a Porsche and Multiple Watches and to Improve the Green Hollow Road Home ........................................................................... 7

    D.  Meli and Two Co-conspirators Use Investor Funds to Pay Back Prior Investors and to Pay Personal Debts ........................................................................... 8

    E.  Meli Defrauds Another Group of Investors Out of Almost $8 Million ..................... 12

  II.  The Guidelines Calculation ........................................................................... 13

**DISCUSSION** ............................................................................................................ **15**

  I.  The Court Should Impose a Guidelines Sentence ........................................ 15

    A.  The Nature and Circumstances of the Offense, and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment Require a Guidelines Sentence ..................... 15

    B.  A Guidelines Sentence Is Necessary for General and Specific Deterrence, and to Protect the Public ........................................................................... 17

    C.  The Loss Calculation Does Not Overstate Meli's Culpability ..................... 19

    D.  The Court Should Reject Meli's Remaining Arguments ........................... 20

  II.  The Court Should Also Impose Forfeiture ................................................. 23

    A.  Applicable Law ........................................................................... 23

    B.  Discussion ........................................................................... 24

  III.  Restitution ........................................................................... 25

    A.  Applicable Law ........................................................................... 25

    B.  Discussion ........................................................................... 25

**CONCLUSION** ............................................................................................................ **26**

The Government makes this submission in advance of the sentencing of Joseph Meli ("Meli" or "the defendant"), which is scheduled for Thursday, March 29, 2018. In the plea agreement in this case, the parties stipulated that the applicable Guidelines range is 78 to 97 months' imprisonment. The Probation Department agrees with that calculation. As set forth below, the Government submits that a sentence within that range, along with forfeiture and restitution, is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Meli's conduct was not "aberrant," nor did it involve an isolated "lapse in judgment." (Meli Sentencing Mem. at 2). Instead, over a period of years and right up until the time of his arrest, Meli used lies and phony documents to induce over 100 individuals and entities to give him over $100 million dollars. Meli then misappropriated this money, using investors' funds to pay back prior investors in a Ponzi-like fashion and to finance a luxurious lifestyle, including the purchase of a house in the Hamptons, a Porsche 911, and numerous pieces of jewelry and high-end clothing.

Far from demonstrating regret over this purported "lapse," Meli's sentencing submission raises a significant question about whether he has accepted responsibility for his crimes. He claims, for example, that his misrepresentations were "collateral to the fundamental terms of the deal." (Meli Sent. Mem. at 23). This is a materiality argument, plain and simple. Yet the fake agreements he provided to investors went to the heart of what he was marketing—purported access to large blocks of live event tickets, based on his relationships in the ticket industry.

Moreover, his assertion that his ticket deals were largely legitimate is unsupported by any evidence, other than his own statements and the arguments of counsel. Notably, 14 months after his arrest, and despite being represented by two major law firms, and engaging in extensive

third-party discovery in the parallel civil action before Judge Stanton,[1] Meli has produced zero evidence of any actual agreements—paper, "handshake," or otherwise—giving him access to the concerts and shows discussed herein.

To the contrary, the fact that his investors lost tens of millions of dollars in this case confirms what Meli admitted in a recorded statement before his arrest: he ran a "shell game," "all along," "tak[ing] money from one guy to pay off the other guy."  *See* Complaint, *United States* v. *Meli and Simmons*, 17 Mag. 647 (S.D.N.Y. Jan. 26, 2017), ¶ 29(d), attached as Exhibit A.  In addition, while Meli contends "[h]is business operated on handshakes, on trust," (Meli Sent. Mem. at 19), the reality is that it was Meli who betrayed the trust of dozens of investors, some of whom were his longtime friends.

Accordingly, a Guidelines sentence is necessary to reflect the seriousness of the offense, provide just punishment, and general and specific deterrence.

## BACKGROUND

### I. Overview of the Scheme

From at least in or about 2015 up until days before his arrest on January 27, 2017, Meli conducted a scheme to defraud over 100 investors who invested a total of approximately $100 million through false representations that Meli would use investor funds to purchase tickets to various live events for resale at a profit on the secondary market.  (*See* PSR ¶ 19).  In fact, Meli spent much of the investor funds on himself.  He used investor funds to buy, among other things, a $3 million house in East Hampton, New York, a 2017 Porsche convertible, and expensive watches and jewelry.  (*Id.*).  He also used investor funds to further his and others' criminal

---

[1] (*See, e.g.*, *Securities and Exchange Comm.* v. *Meli*, et al., No. 17 Civ. 632 (LLS) (S.D.N.Y.) Dkt. Nos. 141, 142, 145, 146, 147, 148, 149, 152, 153, 154, 155, 156 (reflecting litigation over subpoenas Meli issued to third parties relating to purported ticket agreements)).

conduct.  He used investors' money to pay back his own prior investors, in a Ponzi-like manner, and to pay back a prior investor in a different Ponzi scheme involving a hedge fund named Sentinel Growth Fund Management ("Sentinel") operated by Meli's associate, Mark Varacchi. (*Id.*).[2]

In furtherance of his fraudulent scheme, Meli falsely represented to investors that, through his company Advance Entertainment, LLC ("Advance"), he had entered into written agreements with production companies for popular Broadway shows and with management companies for popular singers to purchase large blocks of tickets to the shows and performances. (PSR ¶ 20).  In reality, Meli had not entered into such agreements and did not have any contractual rights to purchase such tickets.  (PSR ¶ 20).

To convince investors that he had access to these blocks of tickets, Meli created and provided investors with false contracts between him and over at least a half-dozen production or management companies ("the Production and Management Companies").  These included:

- A fake agreement that purportedly between Meli and ███████████████, the company that produces the Broadway show *Hamilton*, relating to *Hamilton* tickets.

- Multiple fake agreements between Meli and ███████████████████, a major concert promotion company, relating to tickets to concerts by Justin Beiber, the Chainsmokers, Ariana Grande, Katy Perry, and Roger Waters.

- A fake agreement between Meli and ████████████████, a concert promotion company, relating to tickets to concerts by the singer Adele.

- A fake agreement between Meli and the ████████████████, relating to performances to the Broadway show *Harry Potter and the Cursed Child*.

---

[2] Varacchi pled guilty to securities fraud, wire fraud, and conspiracy to commit those offenses, on or about February 1, 2017.  *See* Docket, *United States* v. *Varacchi*, 17 Cr. 76 (NRB) (S.D.N.Y.).

- Multiple fake agreements relating to tickets to concerts by the bands Metallica and the Grateful Dead/Dead and Company.

These fake agreements listed, as authorized representatives entering into the agreements on behalf of the Production and Management Companies, the names of individuals who actually worked at those organizations, and furthermore contained fraudulent signatures of these individuals. (*See* PSR ¶ 21).

Below, the Government provides several examples of Meli's false representations to investors and his misappropriation of investor funds.

**A.  Meli Uses Investor Funds to Buy a House in the Hamptons**

For example, in or about August 2015, Meli solicited a particular individual who operated a family-controlled investment office ("Victim Entity-1") to invest with Meli's company, Advance, in the purchase of a large number of tickets to *Hamilton*, for resale on the secondary market.  (PSR ¶ 22).  In furtherance of the fraudulent scheme, Meli e-mailed a representative of Victim Entity-1 a purported draft "Letter Agreement" between Advance and the production company for *Hamilton*, which reflected an agreement between Advance Entertainment and *Hamilton's* producers, allowing Meli to buy 35,000 *Hamilton* tickets for a total of $7,000,000.  (*Id.*).  Meli forwarded this agreement to the representative of Victim Entity-1 along with the note "Signed copy for you coming."   (*Id.*).  However, Meli had no such agreement with *Hamliton's* production company and the Letter Agreement was fraudulent.  (*Id.*).

However, on October 14, 2015, based upon Meli's misrepresentations, Victim Entity-1 wired $3,500,000 to Advance's account at Merrill Lynch (the "3098 Account") to finance Meli's purchase of *Hamilton* tickets.  (*Id.*).  That same day, Meli wired $2,875,000 from the 3098 Account, to an account for law firm located in Bridgehampton, New York ("Law Firm-1").  (*Id.*).  Two weeks later, on October 28, 2015, Meli's wife bought several parcels of land in Suffolk

4

County, New York, including the property at 50 Green Hollow Road, East Hampton, NY (the

"Green Hollow Road House"), for $3 million.  (*Id.*).  The seller of the home confirmed to law

enforcement that the Law Firm represented the Melis at the closing.[3]  In short, Meli used Victim

Entity-1's funds not to buy tickets, but to purchase a home in the Hamptons.

### B.  Meli Uses Investor Funds In Connection with a Separate Ponzi Scheme

Meli also misappropriated investor funds to assist his associate, Mark Varacchi, to repay

an investor in Varacchi's hedge fund, whose funds Varacchi had in turn misappropriated.  This

occurred when, in or about December 2015, an investor in Varacchi's hedge fund, Sentinel

Growth Fund Management (the "Sentinel Investor"), discovered that Varacchi had

misappropriated the Sentinel Investor's funds and threatened to expose Varacchi's fraud.  (PSR ¶

23).  Varacchi turned to Meli for assistance, explaining to Meli that Varacchi had an investor

who had demanded the return of his investment, but that Varacchi did not have sufficient funds

to repay the investor.  (*Id.*)  Meli agreed to assist Varacchi.  Between on or about December 29,

2015 and April 15, 2016, Meli made several wire transfers from an account in the name of

Advance to Sentinel, totaling approximately $3.75 million, which Varacchi then used, in part, to

repay the Sentinel Investor.  (PSR ¶ 24).

The money Meli wired to Sentinel to assist Varacchi in repaying the Sentinel Investor

included, among other things, funds from another investor in Meli's ticket scheme ("Victim

Entity-2").  (PSR ¶ 25).  In or about December 2015, shortly before wiring Victim Entity-2's

---

[3] Meli paid Victim Entity-1 back its investment using money invested by newer investors and not
by using the proceeds of actual ticket sales.  For example, on or about February 11, 2016,
another investor, Victim-5 wired $5 million to the 3098 account based to finance Meli's
acquisition of Adele tickets.  The same day, Meli wired $3.5 million out of that account to
Victim Entity-1, as a purported repayment on Victim Entity-1's investment.  In Ponzi-like
fashion, Meli later paid Victim-5 a purported return on his investment by using money invested
by another investor, as described further below.

funds to Sentinel, Meli had solicited an investment from Victim Entity-2 of approximately $1.25 under the false pretenses that Meli would use the investment to purchase bulk tickets to *Hamilton* for resale on the secondary market.  Meli provided Victim Entity-2 with a purported "Letter Agreement" between Advance and *Hamilton's* producers, which was similar to the letter Meli provided to Victim Entity-1.  (*Id.*).  Unlike the agreement shown to Victim Entity-1, however, the agreement Meli gave to Victim Entity-2 actually purported to be signed by the managing partner of *Hamilton's* production company (the "Managing Partner").  (*Id.*).  Again, this Letter Agreement was fake; Meli had no agreement to purchase tickets from Production Company-1 and the Managing Partner's signature on the Letter Agreement was forged.  (*Id.*).

On or about December 23, 2015, Meli forwarded to Varacchi an e-mail from an employee of Victim Entity-2 stating, in substance, that Victim Entity-2 had signed documents to invest with Meli and would send its investment upon Meli's direction.  (PSR ¶ 26).  Meli included with this forwarded e-mail the note "[r]est peacefully young prince.  The wolf is on the way," meaning that Meli would soon be in a position to assist Varacchi to repay his investor by misappropriating the investment provided by Victim Entity-2.  (*Id.*)  On December 28, 2015, Victim Entity-2 wired $1.25 million to the 3098 Account, to fund the purported *Hamilton* investment.  The very next day, Meli wired $1.5 million to Sentinel.  (*Id.*)  Before Victim Entity-2's investment, the balance in the 3098 Account was approximately $803,327.20.  Thus, Meli would not have been able to make the payment to Sentinel without misappropriating Victim Entity-2's investment.[4]

---

[4] Shockingly, during the pendency of this prosecution, Meli, through counsel, submitted a Proof of Claim to the court-appointed receiver overseeing claims against Sentinel.  Meli continued to pursue this claim after his guilty plea.

**C.  Meli Uses Investor Funds to Buy a Porsche and Multiple Watches and to Improve the Green Hollow Road Home**

In June 2016, Meli used investor funds to make improvements to the Green Hollow Road House, to purchase jewelry, and to buy a Porsche 911 Turbo (the "Porsche 911").

On June 16, 2016, Victim Entity-3 sent $1,000,000 to the 3098 Account, based on representations by Meli that Meli had an agreement to purchase tickets to concerts by Adele. (*See* Victim Impact Statement of ███████).  Prior to this, the 3098 Account had a balance of $263,267.63.  On June 20, 2016, another investor ("Victim-4") wired $500,000 to the 3098 account, also based on Meli's representation that he had an agreement to buy tickets to Adele. (*See* Victim Impact Statement of ███████).  Before these investments, the 3098 Account, had a balance of $1,384,659.13.[5]

The following day, among other transactions, Meli wire (i) $3,300 to Flawless Jewelry and (ii) $450,000 to Green Home Construction Corporation.  The payment to Green Home Construction represented a partial payment on two contracts that the Melis had entered into with Green Home—one for improvements to the Green Hollow Road House, including interior renovations and construction of a basketball court, and the other for construction of a pool and pool house at the Green Hollow Road House.

On June 23, 2016, with the account balance, $350,122.69, the 3098 Account made a wire transfer of $208,000 to Manhattan Motorcars, Inc.  The next day, Meli closed on the purchase of a Porsche 911 Turbo from Manhattan Motorcars, for a total purchase price of $238,000.

---

[5] Between June 16 and June 20, the 3098 Account also, among other things, charged $4,925.54 at Barneys New York, paid a $2,500 parking bill, and spent over $1,000 at a high-end clothing store in East Hampton New York, over $2,200 at a sporting goods store in East Hampton, New York, and over $1,500 at a swimwear store in the Hamptons.

There were no other deposits in the 3098 account between June 16 and June 24, other than the Victim Entity-3 and Victim-4 investments described above.



Y.).

████████████████████████████████████████

████████████████████████████

### E. Meli Defrauds Another Group of Investors Out of Almost $8 Million

Meli's scheme continued right up until his arrest in January 2017.

In or about late 2016 and early 2017, Meli solicited an investment of approximately $7,860,000 from a group of investors ("Victim Entity-7") under the false pretenses that Meli would use the investment to purchase bulk tickets to the Broadway show *Harry Potter and the Cursed Child* for resale on the secondary market.  (PSR ¶ 30).  One of the principals of Victim Entity-7 was a lifelong friend of Meli's.

In furtherance of the fraudulent scheme, however, Meli provided the investor group with a purported "Letter Agreement" between Advance and the production company for *Harry Potter* which reflected an agreement that Advance would purchase 25,000 tickets to *Harry Potter* from the production company for total of $62,500,000.  (*Id.*).  The Letter Agreement—which Meli provided to a representative of Victim Entity-7 but asked that it not be shared with others— purported to be signed by the Chief Executive Officer of the production company for *Harry Potter* (the "CEO").  (*Id.*)  In fact—once again—the Letter Agreement was fake; Meli had no such agreement to purchase tickets, and the CEO's signature on the Letter Agreement was forged.  Moreover, rather than using the investor funds from Victim Entity-7 to purchase tickets, as Meli had promised, Meli used those funds to repay prior investors in the scheme; to pay for expensive meals, clothing and shoes and other personal expenses, including a $13,000 charge at the Beverly Hills Four Seasons, a $3,000 purchase of wine, and a $43,000 purchase at clothing

store in West Hollywood, CA; and as payment to a law firm to represent Meli in connection with the investigation into Meli's fraud.  (*Id.*).[11]

***

Meli defrauded numerous other investors in a similar manner to those described above. He repeatedly induced investors to give him money by using fraudulent agreements containing forged signatures of purported representatives of the Production and Management Companies and then misappropriated those investors' funds.

## II.    The Guidelines Calculation

Both the parties and the Probation Office calculate the Guidelines as 78 to 97 months' imprisonment.  The base offense level is 7, pursuant to U.S.S.G §2B1.1(a)((1).

The loss involved approximately $59,897,913.71.  The Government calculated this number by analyzing bank records for Advance Entertainment and for three other entities which received investor funds in Meli's scheme—Advance Entertainment II, 875 Holdings, and 127 Holdings.  Together, these accounts received $106,954,565 in investor funds.  Pursuant to Application Note 3(E)(i) to U.S.S.G. §2B1.1, Meli received a credit for money returned to investors prior to his arrest,[12] although it bears noting that these "returns" often were traceable to money Meli got from newer investors.  In addition, the Government omitted from the loss

---

[11] (*See also* 4/16/17 Order, Dkt. No. 49 (granting Government's motion for post-indictment restraining order as to money Meli transferred to Kasowitz, Benson, and Torres before his arrest)).

[12] *See* U.S.S.G. § 2B1.1, App. Note (3)(E)(i) ("Loss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.").

calculation any transactions that it determined did not involve deposits by victim-investors, *e.g.,* numerous wire transfers between Meli and ████ and related entities.  In addition, with respect to many of Meli's larger investors, *i.e.,* individuals who lost over a million dollars, the Government's loss calculations have been corroborated by interviews with those investors or their representatives and/or Victim Impact Statements submitted in connection with sentencing. Accordingly, because the offense involved more than $25,000,000 but less than $65,000,000 in loss, 22 levels are added, pursuant to U.S.S.G. §2B1.1(b)(1)(L).

In addition, two levels are added, pursuant to U.S.S.G. §2B1.1(b)(2)(a)(i), because the offense involved ten or more victims.

The PSR and the plea agreement provide for a three-level reduction, in light of Meli's guilty plea.  Nonetheless, the Government submits that Meli's sentencing submission, in which, as discussed herein, he makes unsupported assertions regarding his purported actual ticket business; claims, despite significant evidence to the contrary, that he tried to dissuade co-conspirators from misappropriating investor funds; and repeatedly blames others, including the Government, for his predicament, raises a real question as to whether acceptance credit is appropriate.  "A defendant who enters a guilty plea is not entitled" to acceptance credit "as a matter of right," particularly where he denies relevant conduct or takes other action inconsistent with acceptance.  *See* U.S.S.G. §3E1.1 App. Note 3 ("Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, *and truthfully admitting or not falsely denying any additional relevant conduct . . .* will constitute significant evidence of acceptance of responsibility . . . .  *However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this*

*section as a matter of right*.").[13]   If the Court determined acceptance credit was nonetheless

appropriate, the resulting Guidelines offense level would be 28.  Meli is in Criminal History

Category I, yielding a Guidelines range of 78 to 97 months.  (PSR ¶¶ 28, 54, Recommendation).

## DISCUSSION

### I.  The Court Should Impose a Guidelines Sentence

The Court should impose a Guidelines sentence.  Such a sentence would be sufficient but

not greater than necessary to serve the legitimate purposes of sentencing.

### A.  The Nature and Circumstances of the Offense, and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment Require a Guidelines Sentence

*First*, a Guidelines sentence is appropriate in light of "the nature and circumstances of the

offense," and the "need for the sentence imposed to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. §

3553(a)(1)-(2).

The offense conduct here was brazen on several levels.  Obviously, it involved

defrauding investors out of tens of millions of dollars, which standing alone makes this an

extremely serious offense.

It is undisputed that Meli knew many of his victims.  Bizarrely, Meli sees this as a

mitigating factor.  The Government disagrees.  Meli's offense conduct involved the repeated

---

[13] In addition, the Government's stipulation to acceptance of responsibility credit in the plea agreement was conditioned not only on Meli's plea allocution, but also "his subsequent conduct prior to the imposition of sentence."  *See* Plea Agreement at 2; *see also id.* at 3 ("Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, see U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence").

deception of friends and colleagues, both to get them to invest in the first instance and then to use those friends to introduce him to other individuals who became victims of the scheme.  (*See, e.g.*, Victim Impact Statement ███████ noting "Meli befriended [his family] several years ago . . . Meli manipulated ███████ to introduce him to other investors"); Victim Impact Statement of ███████ (noting "Joe's continual and brazen lies to my face" over "a half dozen meetings over the course of 2016").  One of the investors in Victim Entity-7 was a childhood friend of Meli's.  Thus, while Meli makes much of how his purported ticket business operated on "trust" and his "trustworthiness," the reality is that he preyed on those that trusted him the most.

Further, Meli asserts that he "generally marketed this opportunity to wealthy individuals who could afford to invest in such a high-risk, high-reward venture[.]"  (Meli Sent. Mem. at 30).  Of course, Meli did not bother to tell his victims that this "high-risk, high-reward venture" was actually a Ponzi scheme and that while the risk would be theirs, the rewards were all his.  The scheme caused his victims financial, emotional, and other real harm. (*See, e.g.*, Victim Impact Statement of ███████ (noting "We had to take out extremely large loans to pay for our family living and expenses"); Victim Impact Statement of ███████ (noting "financial stress," including loss of retirement savings, and "personal stress" extending to "every single aspect of our lives and our children's lives") Victim Impact Statement of ███████ (explaining that money lost with Meli would have been used to buy a home and start a business)).

In addition, while the Government did not require Meli to plead guilty to a separate count of aggravated identity theft as part of his plea agreement, the fact remains that Meli's scheme used the names of real individuals and entities on fake agreements.  Meli's conduct thus also

exposed these individuals to potential reputational and financial harm when Meli's scheme came apart.

### B. A Guidelines Sentence Is Necessary for General and Specific Deterrence, and to Protect the Public

*Second,* a Guidelines sentence is necessary for general and specific deterrence and to protect public from further crimes of the defendant.  18 U.S.C. § 3553(a)(2)(A).

As to specific deterrence and the need to protect the public from further crimes of the defendant, throughout his 70-page sentencing submission, Meli attempts to shift the blame elsewhere, ignoring basic realities of his fraud.  Most notably, Meli goes so far as to blame *the Government* for "some of the losses" to his investors, because of the "business interruption" caused by Meli's "unexpected arrest."  (*See* Meli Sent. at 39).  This is ridiculous.  For one, at the time of his arrest, Meli had defrauded investors out of over $50 million, and thus his arrest should have hardly been unexpected.  Indeed, Meli acknowledged just weeks before the filing of charges in this case that he was running a "shell game," "all along," "tak[ing] money from one guy to pay off the other guy."  (See Complaint, *United States* v. *Meli and Simmons*, 17 Mag. 647 (S.D.N.Y. Jan. 26, 2017), ¶ 29(d), attached as Exhibit A). [14]

Meli's invocation of the fraudster's refrain—that he was just a deal or two away from making everything alright, *see, e.g.*, Meli. Sent. Mem. at 39—indicates that he maintains much the same outlook as he did when he was committing the offense conduct and has learned little, if anything, while awaiting sentencing.  There is no evidence, other than Meli's word, that Meli

---

[14] Similarly, Meli also claims, by way of mitigation, that "his investors were savvy and sophisticated market participants who fully understood the nature of the investment opportunity." (Meli Sent. Mem. at 50).  Of course, the investors did not "fully underst[and]" that there were not, in fact, any actual agreements between Meli and the Production and Management Companies or that Meli was using their money to pay back prior investors, buy a house in the Hamptons, a Porsche, and other luxury items.

"had committed substantial amounts of cash to the purchase of tickets to three major live events . . . that had not occurred.  These tickets had not yet been printed.  Additional millions had bene invested in tickets for Adele and *Hamilton*."  (*See* Meli Sent. Mem. at 39).

There is abundant evidence, however, that, right up until his arrest, Meli was using investor money to pay back other investors and to finance a luxurious lifestyle.  For example, bank records for the 3098 Account, the primary account that received investor funds, show that the account received $10.81 million in credits in January 2017, largely from investors, and spent almost the exact same amount, $10.37 million, during that month.  Most of the spending involved repayments to prior investors and expenditures on what appear to be luxury items, including charges of approximately $44,000 to two wine distributors; $5,300 at restaurants; $53,195.32 at clothing stores; $2,872.72 on car services; $18,750 on airfare, and $20,591.91 on hotels, including a $2,800 charge at location that markets itself as a "a luxury eco chic hotel and wellness center and a premier yoga retreat studio"—all in a single month.

As such, Meli's repeated assertions and insinuations that the investor losses were due to his "cash problem," his lack of record-keeping acumen, and the actions of others, including the Government, ignore basic realities of the record in this case.  And they strongly suggest that, because Meli has failed to come to grips with what he actually did, specific deterrence is a unusually critical sentencing factor in this case and therefore that a Guidelines sentence is necessary.

As to general deterrence, while Meli makes much of the media attention that this case has received, that fact only highlights the need for a significant sentence of imprisonment here.  The Court's sentence will undoubtedly send a message to the public.  If Meli were to receive only a modest custodial term, the press coverage he heralds will convey that to all those performing the

risk/reward calculus inherent in embarking upon a significant white-collar crime.  Respectfully, the Government submits that the message should not be that fraudsters who cheat people out of tens of millions of dollars are treated leniently.

### C.  The Loss Calculation Does Not Overstate Meli's Culpability

Meli argues for a below-Guidelines sentence because, he claims, the Guidelines overstate his culpability.  (*See* Meli Sent. Mem. at 37-39).  The Court should reject this argument.

*First*, the loss amount in this case, approximately $60 million, is at the high end of the $25,000,000 to $65,000,000 loss range in U.S.S.G. §2B1.1(b)(1)(L).  This is significant because even if the Government and the Probation Department were mistaken in their Guidelines calculation (as to which the defendant has stipulated), they would have to be almost $35 million off for the next lower Guidelines range to apply.

*Second*, the current loss amount gives Meli credit for money paid back to investors, even though these "returns" often represent money misappropriated from newer investors.  Relatedly, "net winners," *i.e.,* individuals who received back their principal from Meli, are not reflected in the loss figure or on the Schedule of Victims.  As such, the loss figure in some ways actually understates Meli's culpability because it does not reflect the full extent of his actions in fraudulently inducing individuals to invest with him.

*Third*, while the terms and conditions of the purported 875 Holdings investment were somewhat different than the investments described above, the losses of investors in 875 Holdings are properly counted as part of the loss figure.  For one, as evidenced by Victim Impact Statements, Meli was involved in soliciting these investments.  (*See, e.g.*, Victim Impact Statement of ██████████████).  Moreover, investor funds were routinely transferred between and among the various 875 Holdings, 127 Holdings, Advance Entertainment, and

Advance Entertainment II accounts, and misappropriated.  Meli's arguments regarding 875 Holdings are simply another example of his efforts to blame everyone but himself for the offense conduct here.

Finally, Meli's other arguments regarding the loss amount, including his conclusory arguments regarding "actual business losses," "non-ticket related business ventures," and "finder's fees," largely echo other themes throughout his sentencing submission.  Again, Meli seeks to blame others, and despite being represented by two major law firms, presents no evidence to support these arguments, other than his own say so.  Respectfully, the Court should not rely on the word of an admitted fraudster who indisputably defrauded investors out of tens of millions of dollars.

### D.  The Court Should Reject Meli's Remaining Arguments

The Court should reject Meli's remaining arguments regarding the § 3553(a) factors.

First, a Guidelines Sentence would not result in "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

To begin, the loss amount of $25,000,00 to $65,000,000, which the parties have stipulated to, plainly puts Meli among the most culpable of fraud defendants nationwide. Sentencing Commission statistics for 2016, the most recent year for which data is available, show only 0.7 percent of defendants sentenced pursuant to U.S.S.G. § 2B1.1 had a loss figure of greater than $20,000,000.  See U.S. Sentencing Comm., Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2016, at 8-10.[15]

---

[15] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2016/Use_of_SOC_Offender_Based.pdf.

Moreover, sentencing considerations are, of course, unique to each case, and, in the cases cited on page 58 of Meli's submission which involved 78 to 97 month Guidelines ranges, there were mitigating circumstances not present here.  In *United States* v. *Hochfeld*, for example, the Government noted that, prior to sentencing, the "defendant had been extremely cooperative," working "with the SEC in gathering the assets and trying to work things out with investors." Transcript, *United States* v. *Hochfeld*, No. 13 Cr. 21 (PAC) (S.D.N.Y. 2013), ECF No. 28, at 15. In imposing sentence, Judge Crotty also noted the "unusual circumstances" of the case, in which many of the defendant's victims submitted letters "saying kind and generous things" about him. *Id.* at 19-20.  In *United States* v. *Hampton*, Judge Sweet noted "the defendant's immediate cooperation when approached by the Government, his showing of remorse for his acts, [and] his motivation for conducting the offense," which was to recover losses his hedge fund suffered as a result of legitimate trading.  *See United States* v. *Hampton*, No. 13 Cr. 301 (RWS), 2013 WL 5366378, at *6 (S.D.N.Y. Sept. 25, 2013).  In *United States* v. *Gray*, the defendant appears to have suffered from deep psychological issues, and, also proffered with the Government multiple times.  Transcript, *United States* v. *Gray*, No. 15 Cr. 97 (SHS) (S.D.N.Y. Oct. 25, 2017), ECF No. 58, at 10-11, 35.[16]

As such, none of these cases are useful analogs to this one.  Again, in the 14 months since his arrest, Meli has made no efforts to assist the Government or the SEC in returning funds to

---

[16] In addition, in *United States* v. *Newkirk*, Judge Rakoff calculated the Guidelines range as 57 to 71 months–not 135 to 168 months as Meli's submission states.   Transcript, *United States* v. *Newkirk*, No. 14 Cr. 534, (S.D.N.Y. Apr. 21, 2016), ECF No. 136 at 4.  Finally, in *United States* v. *Shamilzadeh*, No. 04 Cr. 194 (JG) (E.D.N.Y. Apr. 1, 2008), cited on page 61 of Meli's submission, then-Judge Gleeson noted "the extraordinary timing of [the defendant's] cooperation and its nature," *see* Meli Sent. Mem. at 61, circumstances clearly not present here.

investors.[17]  It appears that only one investor, out of over 100, has submitted a letter on Meli's

behalf.  ██████████████████████████████████████████████████████

██████████████████████████████████████████████.  Perhaps

most significantly, once again, blame-shifting and minimizing, not "remorse," are the themes

that echo throughout Meli's sentencing submission.

Accordingly, the Court should reject Meli's arguments regarding unwarranted sentencing

disparities.

*Second*, the Court should reject Meli's arguments that his history and characteristics

militate towards a below-Guidelines sentence.  For one, Meli's only employment during the

period of the offense conduct was his purported ticket-selling business.  (PSR ¶¶ 87-88).  Thus, it

is certainly reasonable to infer that much of Meli's purported charity and generosity over the last

several years was unwittingly funded by his victims.  Further, while the defendant's conviction

undoubtedly impacts his family, this is unfortunately true in any criminal case and thus does not

warrant a variance.[18]

*Finally*, the Court should reject Meli's suggestion that a non-Guidelines sentence is

necessary to help Meli make restitution.  As a threshold matter, this argument is nearly always

available to white collar defendants and, if adopted, would simply provide fraudsters a way to

---

[17] Similarly, the Court should reject defense counsel's suggestion that leniency is warranted because counsel offered to make Meli available for a proffer session.  The Government declined this invitation because of its doubts about Meli's veracity, a concern that has been borne out by the blame-shifting and lack of remorse that pervades his sentencing submission.

[18] As to his college education, Meli's sentencing submission asserts that "Joe always thought that he had graduated from the University of Utah, [but] he discovered *in 2015* during a background check that he was a few credits shy of a bachelor's degree, due to an issue with credits transferred from Boston University."  (Meli Sent. Mem. at 7 n.2).  It bears noting, however, that multiple investor presentations *from 2016* obtained by the Government represent that Meli held a bachelor's degree from the University of Utah.

purchase their liberty at the sentencing phase.  Such a paradigm would be antithetical to the idea of equal justice under law.  Moreover, Meli provides no concrete information on how he intends to cover tens of millions of dollars in investor losses.  And the Government is unaware of any tangible steps Meli has made to make investors whole in the 14 months since his arrest.[19]  Any reduction in Meli's sentence would provide little, if any, increase in the likelihood that restitution will be paid in full here.

**II.      The Court Should Also Impose Forfeiture**

The Court should also impose forfeiture, in the form of a money judgment for $104,764,565.00, to be satisfied in part by the forfeiture of certain specific property listed in the Indictment and traceable to Meli's offense.

**A.  Applicable Law**

The forfeiture statute pertaining to securities fraud broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation."  18 U.S.C. § 981(a)(1)(C).

In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may obtain a money judgment against the defendant to recover the amount of the defendant's crime proceeds.  *E.g.*, *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond).

---

[19] The Court should reject defense counsel's suggestion that leniency is warranted because of Meli's efforts in "gathering available funds" and "provid[ing] information and documents to U.S. Probation."  Every defendant is required to provide the Probation Department with truthful and complete information

The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses.  *See, e.g., United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (defendant convicted of food stamp fraud was properly-sentenced to a forfeiture money judgment equal to the entire loss amount paid by the government, without subtracting the amount of cash that the defendant shared with the food stamp beneficiary; "Because the statute [18 U.S.C. § 981(a)(2)(A)] directs that 'proceeds' are not limited to net profits from the crime, and because any proceeds directly traceable to food stamp fraud are subject to forfeiture, the district court did not commit error by entering a forfeiture order equal to the entire loss amount."); *United States* v. *Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme.").

A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment.  *United States* v. *Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at *4-5 (S.D.N.Y. Oct. 24, 2007) ("Where a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money judgment against the defendant is effectively an in personam judgment in the amount of the forfeiture order.").

**B.  Discussion**

The Court should impose a money judgment for $104,764,565, representing the gross proceeds Meli received from his scheme.  (Sweeney Aff.  ¶ 12).

To partially satisfy the money judgment, the Court should also order forfeiture of certain specific properties listed in the indictment.  As explained more fully in the accompanying

24

affidavit of FBI Special Agent Sean Sweeney, Meli's purchase of these properties is traceable to the fraudulent scheme described above.

## III.   Restitution

The Court should also order restitution.

### A. Applicable Law

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to the offense at issue because Meli's offenses were committed by fraud or deceit. See 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that, regardless of a defendant's economic circumstances, the Court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A); *see United States* v. *Coriaty*, 300 F. 3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole").

The Government bears the burden of demonstrating the loss amount sustained by the victim because of the offense. 18 U.S.C. § 3664(e). Any dispute as to the proper amount or type of restitution is to be resolved by the court by a preponderance of the evidence. *Id.* "Findings of the amount of loss may be based upon reasonable estimates." *United States* v. *Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) (citing *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).

### B. Discussion

Here, the Court should order restitution as set forth on the attached Proposed Restitution Order and Schedule of Victims.[20] As discussed above, the victims of Meli's fraud are those

---

[20] For a number of victims on the Schedule of Victims, the Government is still attempting to obtain and/or verify address information. If the Government obtains additional address information before sentencing, it will submit an updated list to the Court.

individuals who invested in Meli's purported ticket resale opportunities during the relevant time period and who sustained losses because of those investments. [21]

## CONCLUSION

For the reasons set forth above, the Court should impose a Guidelines sentence and forfeiture and restitution.

Dated:  New York, New York
        March 21, 2018

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        for the Southern District of New York

                  By:   _____
                                        Elisha J. Kobre
                                        Brendan F. Quigley
                                        Assistant United States Attorneys
                                        Tel.:  (212) 637-2599/2190

---

[21] In addition, two investors submitted claims for legal fees incurred as a result of Meli's scheme, and the restitution figure includes these fees.  "The order of restitution shall require that [the] defendant . . .  reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  The Second Circuit has held that "'other expenses' incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs."  *United States* v. *Amato*, 540 F.3d 153, 159 (2d Cir. 2008)