UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA
                                              :
        - v. -
                                              :   S1 17 Cr. 127 (KMW)
STEVEN SIMMONS,
                                              :
                Defendant.
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# THE GOVERNMENT'S SENTENCING MEMORANDUM


                                                    GEOFFREY S. BERMAN
                                                    United States Attorney for
                                                    the Southern District of New York

Elisha J. Kobre
Brendan F. Quigley
Assistant United States Attorneys
    - Of Counsel

The Government respectfully submits this memorandum in advance of the sentencing of Steven Simmons, which is scheduled for Tuesday, April 3, 2018. In the plea agreement, the parties stipulated that the applicable Guidelines range is 37 to 46 months' imprisonment. As set forth below, the Government submits that a sentence within that range, along with forfeiture and restitution, is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Simmons's crime was not, as he asserts, a product of "foolish faith" in the success of a legitimate investment or a result of "reckless[ness]." (Simmons Ltr. at 4). Simmons simply lied to his victims – including a divorced single mother of three children – and then stole their money. Simmons then used his victims' money to fund a lavish lifestyle, including his purchase of a $700,000 house in Wilton, Connecticut.

A Guidelines sentence is necessary to reflect the seriousness of the offense, provide just punishment, and general and specific deterrence.

## The Offense

Beginning in at least 2014, Simmons solicited wealthy individuals and investors to invest in a Connecticut-based hedge fund named Sentinel Growth Fund Management ("Sentinel"). Sentinel was run by Mark Varacchi, together with a partner, and marketed itself as having access to high performing portfolio managers. After Sentinel was founded in 2013, Simmons approached Varacchi and offered to solicit investors for the fund. Simmons did so, operating through companies he owned named ▬▬▬▬▬▬▬▬▬▬ and ▬▬▬▬▬▬▬▬▬▬ Simmons had office space within Sentinel's office.

During the course of Sentinel's operations, Simmons, together with Varacchi, operated Sentinel in a Ponzi-like manner, embezzling investor money and soliciting new investors to repay prior investors.[1]

1. **Simmons Defrauds ▮▮▮▮ of $5.95 Million and Uses Proceeds of the Fraud to Purchase a 2.5 Acre Residence in Wilton, Connecticut and Pay other Personal Expenses.**

Simmons met ▮▮▮▮ in 2011 on a train from New York City to Connecticut and they became romantically involved.[2] In 2012, Ms. ▮▮▮▮ who has three children, finalized her divorce and invested the proceeds of an alimony payment with an investment group. Simmons learned of Ms. ▮▮▮▮ divorce settlement. In 2014, Simmons told Ms. ▮▮▮▮ that she was not receiving large enough returns on her capital and was being charged too much in adviser fees. Simmons advised Ms. ▮▮▮▮ to withdraw her money and invest, through Simmons, in Sentinel.

Simmons lied repeatedly to Ms. ▮▮▮▮ to get her to invest with him. Simmons told her that he had personally invested in Sentinel, her capital would be invested with Sentinel in securities, her principal investment would be preserved and not commingled with other investor funds, and that she would receive a return of at least 15% on the investment. These were lies.[3]

In fact, Simmons simply stole a large portion of Ms. ▮▮▮▮ money. As directed by Simmons, Ms. ▮▮▮▮ wired her initial $3,850,000 investment to Simmons on August 7, 2014.

---

[1] Varacchi pled guilty to securities fraud, wire fraud, and conspiracy to commit those offenses, on or about February 1, 2017. *See* Docket, *United States* v. *Varacchi*, 17 Cr. 76 (NRB) (S.D.N.Y.).

[2] Ms. ▮▮▮▮ is "Victim Entity-1" in the PSR.

[3] Simmons also failed to tell Ms. ▮▮▮▮ that, as of September 13, 2013, he had been barred by the Financial Industry Regulatory Authority ("FINRA") from associating with any FINRA member financial firm. *See* https://brokercheck.finra.org/individual/summary/2957967. This bar related to Simmons's misappropriation of money from a brokerage firm where he worked and alteration of an invoice to make it appear that he had paid an invoice that he had not paid.

Simmons's account at the time had a balance of $500. The following day, Simmons used about $48,000 of this money to pay his American Express ("AMEX") bill. And days later, on August 11 and 12, 2014, Simmons (1) withdrew or transferred to a personal account $1,050,000; and (2) wired $700,000 to Varacchi's personal account. On August 21, 2014, Ms. ▇▇▇ wired an additional investment to Simmons of $2.1 million. A week later, Simmons paid an additional $56,000 to AMEX before wiring $4 million to Sentinel. In total, Simmons sent only $4 million of Ms. ▇▇▇ $5.95 million to Sentinel. The rest he simply kept for himself.

When Simmons transferred $1,050,000 of Ms. ▇▇▇ money to his personal account, that account had a balance of less than $1,000. Simmons used that money, among other things, to purchase a 2.5 acre property in Wilton, Connecticut on October 1, 2014, less than two months after stealing Ms. ▇▇▇ money. Simmons also continued to use Ms. ▇▇▇ investment to pay more large AMEX bills.

For years following Ms. ▇▇▇ investment, Simmons provided her with false account statements representing that her entire $5,900,000 principal investment was intact, that she was earning returns, and that Simmons was paying taxes on her investment. Again, these were representations were false. Simmons had stolen much of Ms. ▇▇▇ money and provided the rest to Varacchi. Even that amount was not legitimately invested on her behalf. Instead, Varacchi, simply used it in a Ponzi-like scheme to pay off other Sentinel investors.

Indeed, Simmons continued participating in the Sentinel fraud for years, skimming the majority off the roughly $70,000 monthly coupon payments from Sentinel that Simmons told Varacchi were going to Ms. ▇▇▇ Instead Simmons generally stole the majority of each of these payments, giving Ms. ▇▇▇ $30,000 and representing, again falsely, that those interest payments

were net of taxes. This embezzlement continued for years, from 2014 through late 2016 when the Sentinel scheme was ultimately uncovered.

### 2. Simmons Solicits a $700,000 Investment from the ▮▮▮▮ Family to Repay a Prior Sentinel Investor.

In late November 2015, one of Sentinel's large investors (the "Prior Investor") learned that its investment had been misappropriated and threatened to report Varacchi and Sentinel to the Securities and Exchange Commission (the "SEC"). Varacchi asked Simmons for help to repay this investor and Simmons agreed to solicit money from another investor for this purpose. In December 2015, Simmons approached the ▮▮▮▮ ("▮▮▮▮ a family investment office, from whom he had previously solicited a $250,000 investment in Sentinel.[4] Simmons solicited ▮▮▮▮ for an additional investment, falsely telling the CEO of ▮▮▮▮ that its funds would be allocated among four portfolio managers working with Sentinel. Simmons even followed up by sending ▮▮▮▮ performance information for two of these portfolio managers.

Based on these false representations, ▮▮▮▮ invested an additional $700,000 with Simmons into Sentinel. Within minutes of ▮▮▮▮ wiring its first $600,000 to Sentinel, $500,000 of that money was wired to the Prior Investor. The following day, $50,000 of ▮▮▮▮ money was wired to an account controlled by Simmons. Simmons withdrew $25,000 of this money that same day and used a large part of the rest days later to pay an AMEX bill.[5]

---

[4] ▮▮▮▮ is Victim Entity-3 in the PSR.

[5] In an objection to the PSR, Simmons claims that he was not told in December 2015 that the Prior Investor's money had been misappropriated but rather only that the Prior Investor had pulled its investments. That is false. First, it is directly contradicted by Varacchi. *See* Complaint, *United States* v. *Meli and Simmons*, 17 Mag. 647 (S.D.N.Y. Jan. 26, 2017), ¶ 15. It is moreover contradicted by an e-mail exchange between Simmons and Varacchi dated December 2, 2015. That e-mail was sent amidst desperate efforts amongst the co-conspirators to obtain additional funds to repay the Prior Investor. In the e-mail, Varacchi forwards to Simmons an e-mail from co-conspirator Joseph Meli in which Varacchi states he is "really being pushed" and Meli responds

**The Guidelines**

Both the parties and the Probation Office calculate the Guidelines as 37 to 46 months' imprisonment. The base offense level is 6, pursuant to U.S.S.G §2B1.1(a)(2).

The loss involved approximately $6,900,000. This is the sum of Ms. ▮▮▮ investment, $5,950,000 and ▮▮▮ investment, $950,000. Accordingly, because the offense involved more than $3,500,000 but less than $9,500,000 in loss, 18 levels are added, pursuant to U.S.S.G. §2B1.1(b)(1)(J).

Subtracting three offense levels for acceptance of responsibility pursuant to U.S.S.G § 3E1.1 yields a total offense level of 21. Together with Criminal History Category I, this yields a Guidelines range of 37 to 46 months' imprisonment.

**DISCUSSION**

The Court should impose a Guidelines sentence. Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

*First*, a Guidelines sentence is appropriate in light of "the nature and circumstances of the offense," and the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(1)-(2).

The offense conduct here was brazen, long term, and cruel. Simmons knew that Ms. ▮▮▮ was a recently divorced single mother of three whose financial security depended upon an alimony settlement she received as part of a divorce settlement. Simmons knew that Ms. ▮▮▮

---

"Bro – I got you. Rest easy. It's a lock." Varacchi forwards this e-mail to Simmons noting "Don't know how to act …seems way to optimistic." Simmons responds "Either way..I'll fool myself to sleep tonight [sic]." Clearly, Simmons understood the severity of the situation and that the Prior Investor's threat could result in exposing the fraudulent scheme.

5

trusted him. Nonetheless, Simmons lied to her to get her to withdraw her money and give it to Simmons based on promises that it would be protected. Instead, Simmons immediately stole about $2 million of that money and gave the rest to Varacchi to fund the fraudulent Sentinel scheme. Simmons then used Ms. ▮▮▮▮ money to buy a large house and to pay his oversized AMEX bills.

As Ms. ▮▮▮▮ says in her victim impact statement, "Mr. Simmons's conduct was so devastating to my life and my children's lives that I can't bring myself to be in the same room as him." Simmons badgered Ms. ▮▮▮▮ to withdraw all her money and give it to him, and then stole that money leaving her with limited means of support. "He took advantage of me in every possible way." (Victim Impact Statement of ▮▮▮ ▮▮▮▮▮▮

As to the ▮▮▮▮▮ investment, Simmons used that unwitting victim – a family investment office – to further the Sentinel fraud by telling blatant lies about how ▮▮▮▮▮▮ money would be used. By doing so, and thereby ensuring a prior investor threatening to reveal the scheme was repaid, Simmons ensured that the Sentinel fraud could continue for another year and even more investors defrauded.

*Second*, a Guidelines sentence is necessary for general and specific deterrence and to protect public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A).

As to specific deterrence and the need to protect the public from further crimes of the defendant, Simmons's sentencing submission suggests that he has not fully acknowledged his conduct and the Court can therefore have little assurance that he will not repeat it. Simmons claims he believed that his scheme would "lead to riches for the two Sentinel investors he recruited" and that the "disappearance" of his victims' money was due in part to Simmons's "foolish faith in the eventual success of the Sentinel investment scheme." (Simmons Ltr. at 4). This is simply false.

6

Ms. ▉ investment "disappear[ed]" because Simmons stole much of her money as soon as he received it. And ▉ money disappeared because Simmons never even intended that it would be invested. Simmons solicited it so that it could be used to repay a prior investor. Simmons could not remotely have believed that such conduct would lead to riches for either of these investors.

More frighteningly, however, Simmons claims to remorsefulness seem more related to his being wrong in the purported belief in the constant refrain of the fraudster "that it would all work out in the end." His submission pays short shrift to the fact that Simmons repeatedly and consistently lied to investors to get their money. As a result, specific deterrence is a crucial sentencing factor in this case for which a Guidelines sentence is necessary.

General deterrence, too, is critical here. Absent a substantial period of imprisonment, others inclined to this sort of conduct may make a cost/benefit analysis that makes the risks seem worthwhile. A substantial custodial sentence is necessary to ensure that such conduct is sufficiently deterred.

*Third*, the Court should reject Simmons's arguments that his history and characteristics militate towards a below-Guidelines sentence. While Simmons's volunteer work is laudable, it does not mitigate the seriousness or heartlessness of his crimes, the severe impact inflicted on his victims, or the necessity for specific and general deterrence.

Similarly, while the impact of incarceration on Simmons's family is truly unfortunate, that consideration is frequently cited and should not be a basis for a variance. *Cf. United States v. Sprei*, 145 F.3d 528, 534 (2d Cir. 1998) ("Family ties and responsibilities are a discouraged basis for departure. . . .This is because 'many defendants shoulder responsibilities to their families . . . . Disruption of the defendant's life, and the concomitant difficulties for those who depend on the

7

defendant, are inherent in the punishment of incarceration.'") (internal citation omitted) (quoting U.S. Sentencing Guidelines Manual § 5H1.6 policy statement.). Ultimately, it is Simmons's own criminal conduct that is responsible for any disruption in the lives of his loved ones.

Finally, the Court should reject Simmons's suggestion that a non-Guidelines sentence is necessary to help Simmons make restitution. As a threshold matter, this argument is nearly always available to white collar defendants and, if adopted, would simply provide fraudsters a way to purchase their liberty at the sentencing phase. Such a paradigm would be antithetical to the idea of equal justice under law. Moreover, Simmons provides no concrete information on how he intends to cover the nearly $7 million in losses he caused to his investors. Any reduction in Simmons's sentence would provide little, if any, increase in the likelihood that restitution will be paid in full here.

## The Court Should Also Impose Forfeiture and Restitution

The Court should also impose forfeiture, in the form of a money judgment for $6,900,000, to be satisfied in part by the forfeiture of the property located at ███████████ Wilton Connecticut, 06897 (the "Specific Property") listed in the Forfeiture Bill of Particulars filed on March 23, 2017 (Dkt. # 28) and traceable to Simmons's offense; and restitution in the amount of $6,238,000.

### A. The Court Should Impose Forfeiture in the Amount of $6,900,000 to be Satisfied in Part by Forfeiture of the Specific Property.

#### 1. Applicable Law

The forfeiture statute pertaining to securities fraud broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation." 18 U.S.C. § 981(a)(1)(C).

In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may obtain a money judgment against the defendant to recover the amount of the defendant's crime proceeds.  *E.g., United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond).

The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses. *See United States v. Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme."). Additionally, a money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *United States v. Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at *4-5 (S.D.N.Y. Oct. 24, 2007) ("Where a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money judgment against the defendant is effectively an in personam judgment in the amount of the forfeiture order.").

**2. Discussion**

The Court should impose a money judgment for $6,900,000, representing the gross proceeds Simmons received from his scheme, as Simmons agreed in his plea agreement.

To partially satisfy the money judgment, the Court should also order forfeiture of the Specific Property.  As explained more fully in the accompanying affidavit of FBI Special Agent Sean Sweeney, Simmons's purchase of the Specific Property is traceable to the fraudulent scheme described above.  *See* Sweeny Aff., attached hereto as Exhibit A.  A proposed consent preliminary

order of forfeiture, for a money judgment in the amount of $6,900,000 is attached hereto as Exhibit B.  A preliminary order of forfeiture as to the Specific Property is attached hereto as Exhibit C.

### B. The Court Should Order Restitution in the Amount of $6,238,000 Payable to the Victims of His Offense.

#### 1. Applicable Law

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to the offense at issue because Simmons's offense was committed by fraud or deceit.  *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).   The MVRA provides that, regardless of a defendant's economic circumstances, the Court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court."   18 U.S.C. § 3664(f)(1)(A); *see United States v. Coriaty*, 300 F. 3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole").

The Government bears the burden of demonstrating the loss amount sustained by the victim because of the offense.  18 U.S.C. § 3664(e).  Any dispute as to the proper amount or type of restitution is to be resolved by the court by a preponderance of the evidence.  *Id.* "Findings of the amount of loss may be based upon reasonable estimates."  *United States v. Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) (citing *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).

#### 2. Discussion

Here, the Court should order restitution as set forth on the attached Proposed Restitution Order and Schedule of Victims.  As discussed above, the victims of Simmons's fraud are those individuals or entities who from whom Simmons solicited investments during the relevant time

period and who sustained losses because of those investments.[6]  A proposed restitution order is attached hereto as Exhibit D.

---

[6] The total restitution amount of $6,238,000 is less than the forfeiture amount of $6,900,000 to account for payments made by Ms. ▮▮▮▮▮ during the course of the scheme.

**CONCLUSION**

For the reasons set forth above, the Court should sentence the defendant to a term of imprisonment within the applicable Guidelines range of 37 to 46 months' imprisonment, impose forfeiture in the amount of $6,900,000, to be satisfied in part by the forfeiture of the Specific Property, and impose restitution in the total amount of $6,238,000.

Dated: New York, New York
March 27, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
for the Southern District of New York

By: _____/s/_____
Elisha J. Kobre
Brendan F. Quigley
Assistant United States Attorneys
Tel.: (212) 637-2599/2190